## N. M. CARVER v. THE STATE.

### No. 1309.   Decided November 1, 1911.

### Rehearing denied June 19, 1912.

**1.—Murder—Reputation of Deceased—Evidence—Charge of Court.**

Where, upon trial of murder, the defendant introduced some ten or twelve witnesses who testified that the reputation of deceased was that of a violent and dangerous man, and if he made a threat he was calculated to carry the same into execution, there was no error in not permitting the defendant to introduce additional testimony on that issue, there being no contest about it; neither did the court err in refusing a special charge relating to the weight to be given this testimony.

**2.—Same—Evidence—Res Gestae—Statement of Deceased.**

Where, upon trial of murder, the deceased made a statement to his physician, within a few minutes after he was shot, and at the time he was suffering and bleeding from the wounds inflicted by the defendant, giving in detail his version of the difficulty, the same was admissible as a res gestae statement. Following Lewis v. State, 29 Texas Crim. App., 201, and other cases.

**3.—Same—Evidence—Statement of Counsel.**

While it was improper for State's counsel to make the statement that he would excuse a witness because the court had ruled out testimony of a similar kind, which was to show that a State's witness whom defendant attempted to impeach had given the same testimony before the grand jury, and which was really admissible, there was no error.

**4.—Same—Charge of Court—Self-Defense—Threats.**

Where, upon trial of murder, the court in his charge on self-defense as well as on manslaughter fully instructed the jury that they should take into consideration all therats communicated to defendant, and other facts and circumstances in evidence in passing on the state of defendant's mind, there was no error in refusing special instructions on this theory of the case.

**5.—Same—Charge of Court—Uncommunicated Threats.**

Where, upon trial of murder, all the defense testimony showed an absolute assault, and sought to justify self-defense on an actual assault and apparent danger therefrom; the State's witness denying such assault, there was no reversible error in the failure of the court to charge on uncommunicated threats to show who was the aggressor; the court fully submitting the question of superior strength of and threats by deceased.

**6.—Same—Charge of Court—Aggravated Assault.**

Where, upon trial of murder, the evidence showed that the knife used by defendant was a deadly weapon and that he killed deceased with malice, there was no error in the court's failure to charge on aggravated assault.

**7.—Same—Case Stated—Charge of Court.**

Where, upon trial of murder, the defendant was convicted of manslaughter, and the evidence showed that the defendant used abusive epithets towards deceased, who attacked defendant thereupon in his shirt sleeves, and did not attempt to draw a weapon but fought defendant with his fists and hand, and

the court fully submitted threats by deceased, disparity of strength and size etc., there was no error, under article 723, Code Criminal Procedure.

### 8.—Same—Self-Defense—Provoking Difficulty—Imperfect Self-Defense.

While one has a right to defend against any character of assault upon him, the law is different if one bring on the difficulty or is the aggressor, then he has only imperfect right of self-defense which will not justify but only reduce the grade of offense.

### 9.—Same—Rule Stated—Provoking Difficulty.

Whenever a party, by his own wrongful acts, produces a condition of things wherein it becomes necessary for his own safety that he should take life or do serious bodily harm, then the law wisely imputes to him his own wrong and its consequences to the extent that they may and should be considered in determining the grade of offense, which but for such act, would never have been occasioned. Following King v. State, 13 Texas Crim. App., 283, and other cases.

### 10.—Same—Case Stated—No Self-Defense—Charge of Court.

While it may be said to be an issue as to who struck the first blow, yet the State's testimony showing that defendant made the first blow with a knife, following deceased up as he retreated, the defendant admitting that he used and applied insulting language to deceased, striking deceased with a knife when the latter only struck with his hands · and continued to do so until deceased fell, there was no self-defense in the case, and it was immaterial whether the court presented the law as to uncommunicated threats, or refused additional testimony as to the dangerous disposition of deceased.

Appeal from the District Court of Hill. Tried below before the Hon. F. L. Hawkins, in exchange.

Appeal from a conviction of manslaughter; penalty, four years imprisonment in the penitentiary.

The opinion states the case.

*W. C. Wear* and *Morrow & Morrow,* for appellant.—On the question of the issue of self-defense: Childers v. State, 30 Texas Crim. App., 160; Pratt v. State, 96 S. W. Rep., 8; Coleman v. State, 90 S. W. Rep., 499; Garello v. State, 31 Texas Crim. Rep., 61; Swain v. State, 86 S. W. Rep., 338; Allison v. State, 160 U. S., 203; Winn v. State, 54 Texas Crim. Rep., 541.

On question of court's refusal to charge that the deceased was a man of dangerous character and would probably execute his threats: Manly v. State, 62 Texas Crim. Rep., 392, 137 S. W. Rep., 1137; Lundy v. State, 59 Texas Crim. Rep., 131, 127 S. W. Rep., 1032; Carden v. State, 62 Texas Crim. Rep., 607, 138 S. W. Rep., 397.

On the question of the court's failure to charge on uncommunicated threats: Stewart v. State, 36 Texas Crim. Rep., 130; Pate v. State, 113 S. W. Rep., 759.

On question of the court's charge that unless deceased was making an attack on defendant he could not justify himself on the ground of threats: Swain v. State, 86 S. W. Rep., 338; Johnson v. State, 62 Texas Crim. Rep., 284, 138 S. W. Rep., 1024; Rodriquez v. State, 126 S. W. Rep., 266.

On the question of refusing additional testimony about the reputation

of deceased as a dangerous man: Stanley v. State, 62 Texas Crim. Rep., 306, 137 S. W. Rep., 703.

On the question that defendant believed that deceased was armed: Puryear v. State, 98 S. W. Rep., 258.

On the question of the court's failure to charge that it could not be presumed that defendant designed to kill deceased: McDowell v. State, 55 Texas Crim. Rep., 597; Thomson v. State, 93 S. W. Rep., 111; Hightower v. State, 56 Texas Crim. Rep., 248, 119 S. W. Rep., 693.

On question that the law does not require an actual attempt by deceased to execute the threats: Ballard v. State, 62 Texas Crim. Rep., 435, 138 S. W. Rep., 121; Swain v. State, 48 Texas Crim. Rep., 98, 86 S. W. Rep., 338; Duke v. State, 61 Texas Crim. Rep., 19, 133 S. W. Rep., 435; Lundy v. State, 59 Texas Crim. Rep., 131, 127 S. W. Rep., 1035.

On the question of refusing charge and testimony as to uncommunicated threats: Horbach v. State, 43 Texas, 242; Tankersly v. State, 31 Texas Crim. Rep., 595; Stokes v. State, 53 N. Y., 164; Trotter v. State, 37 Texas Crim. Rep., 474; Huddleston v. State, 112 S. W. Rep., 67; Stewart v. State, 36 Texas Crim. Rep., 130; Pate v. State, 113 S. W. Rep., 759; Gilcrease v. State, 33 Texas Crim. Rep., 619; Sebastian v. State, 57 S. W. Rep., 820.

On question of res gestae statement: Bradbery v. State, 22 Texas Crim. App., 278; Caudle v. State, 34 Texas Crim. Rep., 27; Lockhart v. State, 53 Texas Crim. Rep., 593; 11 Cyc., 382-384.

*C. E. Lane,* Assistant Attorney-General, for the State.

HARPER, Judge.—Appellant was indicted for murder by the grand jury of Hill County. When tried he was convicted of manslaughter, and prosecutes this appeal.

1. The first bill of exceptions complains that the court erred in not permitting the defendant to introduce other and additional witnesses to prove that the reputation of deceased was that of a violent and dangerous man, and if he made a threat he was a man calculated to carry such threat into execution. The appellant introduced some ten or twelve witnesses who so testified, when the court asked the prosecuting attorney if he expected to introduce any testimony on this issue, he stated, in the presence of the jury, that he would introduce no witnesses on that subject and no contest would be joined on that issue. Inasmuch as the record shows that the prosecuting officers did not contest this issue, there was no error in not permitting the appellant to pursue this question further. Some discretion must be exercised by the court, and when appellant had introduced a number of witnesses on this point, and the county attorney stated he would not contest the issue, it would be a useless consumption of time to introduce other testimony in regard to a matter which was admitted to be true. Neither

did the court err in refusing to give the special charges relating to the weight to be given this testimony. The appellant requested the court to charge the jury: "The evidence in this case shows without controversy that the general reputation of the deceased, John Alford, was that of a violent, dangerous man, and you will treat that as an established fact in this case," and "The evidence establishes that John Alford was such a character as might reasonably be expected to execute a threat made by him, and you will regard that fact as established in this case." Both of these charges would have been upon the weight to be given the testimony, and the court is no more authorized to give such instructions in behalf of the defendant than he would in favor of the State. But the request for these instructions would indicate that appellant did not consider this a contested question, and in the absence of some showing, that, subsequent to the time the State's attorney announced the State would not contest this issue, some evidence was introduced or argument made by State's counsel seeking to minimize this admission, we hold the court did not err in these respects.

2. The State introduced Dr. J. B. Dunn, who detailed a statement made by deceased on the night of the difficulty. The appellant objected to this testimony (1) on the ground that it was not shown that deceased was in a dying condition, and (2) it was not admissible as a res gestae statement. It was not sought to admit it as a dying declaration, or a statement made in extremis, but the claim was that it was a res gestae statement. The testimony shows that the physician lived about four blocks from the livery stable of deceased, that he was called over the telephone and started, when a carriage came after him, and he was driven to the stable, and that not more than ten minutes elapsed from the time he was called until he arrived at the stable. That he was called within a half hour after the train passed on the Cotton Belt. The difficulty was shown to have taken place some minutes subsequent to the time the train passed; that deceased was lying on a cot when he got there, when the doctor asked him, "Why, my boy, what in the world is the matter with you?" when the deceased detailed his version of the difficulty. The testimony shows that deceased was cut in a number of places, and was suffering, and subsequently died from the wounds inflicted by appellant. In Castillo v. State, 31 Texas Crim. Rep., 152, a statement made a half hour after the occurrence was held to be admissible under the facts of that case, and in that case Judge Davidson quotes approvingly the case of Lewis v. State, 29 Texas Crim. App., 201, wherein this court held:

" 'In order to constitute declarations a part of the res gestae it is not necessary that they were precisely coincident in point of time with the principal fact. If they sprang out of the principal fact, were voluntary and spontaneous, and made at a time so near it as to preclude the idea of deliberate design, they may be regarded as contemporaneous, and are admissible in evidence.' See also Foster v. State, 8 Texas

Crim. App., 248; Boothe v. State, 4 Texas Crim. App., 202; Tooney v. State, 8 Texas Crim. App., 452; Stagner v. State, 9 Texas Crim. App., 441; Warren v. State, id., 619; Neyland v. State, 13 Texas Crim. App., 536; Washington v. State, 19 Texas Crim. App., 521; McInturf v. State, 20 Texas Crim. App., 335; Pierson v. State, 21 Texas Crim. App., 15; Smith v. State, 21 Texas Crim. App., 277; Powers v. State, 23 Texas Crim. App., 42; Irby v. State, 25 Texas Crim. App., 203; Fulcher v. State, 28 Texas Crim. App., 465; Craig v. State, 30 Texas Crim. App., 619.

"In Lewis' case the conviction was for murder, and the statement of the deceased was made to two witnesses, at different times, from a half hour to one and a half hours after the occurrence; in Fulcher's case the statement of the wounded party was made about thirty minutes after he was shot; and in both cases the statements were held to be res gestae. Lewis v. State, 29 Texas Crim. App., 201; Fulcher v. State, 28 Texas Crim. App., 465."

Each case must be judged from the conditions and circumstances in evidence. It is not so much the lapse of time, if made within a reasonable time, as the circumstances in evidence from the time of the difficulty until the time the statement is made, and as it appears in this case that a physician was called in but a few minutes after deceased was cut, that he was suffering and bleeding from the wounds, and the statement was made under these circumstances, we hold the testimony was admissible as a res gestae statement.

3. In another bill of exceptions it is made to appear that the State offered to prove by the witness Bob Horn, when the defendant had laid predicates to impeach him, the statement that the witness made before the grand jury, which was objected to by the appellant, and the objection sustained by the court. State's counsel then stated to the court that he had a member of the grand jury summoned as a witness whose testimony would corroborate Horn, but inasmuch as the court had sustained the objection to permitting Horn to thus testify, he would, by permission, excuse the witness. This statement was improper and should not have been made, but we do not think the jury could have been influenced thereby. It was but an inadvertent statement made to prevent a witness from remaining longer in attendance on court. Especially would this appear not to be harmful, when subsequent to this time the defendant offered testimony to impeach the witness and prove contradictory statements. The State would have been permitted then to support the witness by the testimony by the member of the grand jury. Long v. State, 17 Texas Crim. App., 128; Williams v. State, 24 Texas Crim. App., 637; Campbell v. State, 35 Texas Crim. Rep., 160, and cases cited.

4. All the other grounds relate to errors claimed in the charge, and the failure of the court to give special instructions requested.

From the State's standpoint the evidence would show that appellant and deceased both run livery stables in the town of Hubbard, and both

customarily had conveyances to meet the trains for the purpose of carrying passengers and baggage. On the night of the difficulty a boy employed by deceased and a son of appellant both got hold of a suit case as a lady came off the train. Appellant's son, at the instance of appellant, turned loose, and deceased's boy went off with the baggage. Appellant then remarked: "I am not going to have Barney (his son) run over if I have to kill every son-of-a-bitch in Hubbard," when deceased said to him, "You do not mean to call me a son-of-a-bitch;" when appellant pulled his knife, and deceased said, "I see you have got a knife—I have not got anything but if you will put up that knife, I will whip you—I think you are the dirtiest coward that ever walked the streets of Hubbard and if you will put up that knife I will whip you in a few seconds." That defendant remarked, "Do it, God damn you," and run on deceased and began to cut him, when deceased began backing off. Defendant followed him and kept on cutting him. Deceased fell after backing some distance, when appellant got on him and stabbed him a number of times. Dr. Dunn testified:

"When I got to him (deceased) his condition was bad; he was bloody all over and blood was running through from the cot. With reference to his mental condition, he was perfectly rational. He told me something about the difficulty. He said that the difficulty came up about a transfer and went on to tell me about it. He said that he saw Carver had a knife in his hand and he said he put his hands up that way (raising his hands up in front of him) and told Carver that he didn't have a thing and that if he would put up the knife and fight him fair he would whip him in thirty seconds. And he said that Thad Jones was standing kind of between them and that he didn't know whether Carver pushed him out of the way or run around him, but that he come around Thad Jones and commenced cutting at him and that he commenced backing and backed to the railroad and that his heel hit the railroad track and threw him. He said that up to that time he had been using his left arm fighting off the knife and that he had four cuts on his arm that were all made before he fell and the cuts in his body were all made after he fell, that the one on his neck was made while he was getting up. He said that he had no use of his left arm by this time and was getting up on his right arm. The cut on the back of his neck went in about where the neck joins the body and come up to about the edge of the hair. He said he was in a half sitting posture resting on his left hand and as he raised up the cuts in his left side were made. The two in his left side were made as he fell or about the time he fell, he said. Those two cuts were kind of in his left back. One went into the shoulder blade and the other went below the shoulder blade, just missing the shoulder blade. I investigated those wounds. The lick that killed him—I measured it with my hand, didn't take a tape and measure it, but put my hand up and measured it—it was about five inches below the arm pit—it was just a stab wound. I didn't see the knife, but it looked like an ordinary

knife wound and went to the hollow. The lick in the neck, it went in about where the neck joins the body and came up about two and a half inches to the bone. That was the only bad looking cut he had to look at it. It went to the bone. I put my finger in it and felt the bone. There were two stab wounds in his shoulder blade, one went above it and the other below. The one under the shoulder blade I didn't think at the time went to the hollow but the day he died I could tell by listening that it did. The wound that killed him was this wound and the one in the left side. There were four wounds on the left arm. ·They were all stab wounds. One of them was below the elbow about three inches. I think it went to the bone. He had eight wounds in all. They were all stab wounds except the one in his back. (Witness is handed knife heretofore introduced in evidence.) This knife is opened by a spring. I can open it with one hand. This is a deadly weapon."

Both deceased and appellant were shown to have had ill will one towards the other for a long time prior to the difficulty, growing out of their rivalry in the livery business, and other matters. One or two· witnesses testify to threats made by appellant, while a great number of witnesses testify to threats made by deceased, a number of which were communicated to appellant, one just two days before the difficulty.

Appellant's version of the difficulty is substantially as follows:

"While I was down there (at the depot) I was. talking to a traveling man about a drive for the next day, and he called my attention to the boys and I looked over and my boy and Hilrey Barnett both had hold of a suit case. I went up to them and it was a lady's case, and I asked which one of the boys got it first and she told me she didn't know, so Mr. Alford was standing there and I asked him which got it first and he said that Hilrey did and I made my boy turn it loose and Hilrey taken the suit case and passenger. That was before the train left. When I made my boy turn the grip loose he said, 'Papa, I got it first,' and I told him to go on and he turned and walked off and commenced crying. Right at that time I did not have any further conversation with John Alford about the matter. After the train had left I was talking to Mr. Shelton about this matter and Mr. Alford come by and said something to me. At the time I was talking to Mr. Shelton I did not know where John Alford was until he spoke. I did not think he was on the platform or about the depot, I thought he had gone. He had walked out towards the barn, I thought and I was talking to Mr. Shelton about this transfer, and when Mr. Alford spoke was the first time I knew he was there. I was talking to Mr. Shelton about the way this came up and I told him I wasn't going to let no son-of-a-bitch run over my boy, that they could run over me but they couldn't run over my boy. Immediately after I said that I saw Mr. Alford and he asked me if I was insinuating that he was a son-of-a-bitch and he says, 'If you say that I am a son-of-a-bitch I will whip you in

God's Holy minute' and started towards me. When he began the conversation I think he was about twelve or fifteen feet from me. When he started towards me and said he would whip me I pulled my knife. My purpose in getting my knife was to keep him from killing me. My reason for believing that he would kill me was that he had told me that he would be glad to weigh a ton in my collar and several people had told me he was going to kill me the first chance he got. With reference to his condition when he told me that he would like to weigh a ton in my collar will say that he was mad. Dr. Pitts, Ed Porter and W. H. Willmore were some of the people that had told me that John Alford had said that he was going to kill me the first chance he got. I had received this information from Dr. Pitts on Saturday morning before this happened—on the 9th of July. This difficulty happened on the 11th of July, on Monday night and the conversation I had with Dr. Pitts was on Saturday morning of the 9th. It had been something like two or three months since I had received the information from Ed Porter that John Alford had threatened to kill me. Carter Scroggins had also told me that Alford had said he was going to kill me. He told me that sometime before the city election. I think the city election was sometime in April, about the first of April of this year. I refer to the city election of Hubbard City, for the election of city officers and marshal. John Alford and Mr. Ferris were the candidates for city marshal. I voted for Ferris. Willmore communicated the fact to me that Alford had threatened my life something like a year ago. I was acquainted with John Alford's reputation in that community with reference to whether he was a peaceable, quiet, law-abiding man or a violent, pugnacious, dangerous man. His reputation in that respect was bad. I was at that time acquainted with his reputation in that respect and it was then bad. From my knowledge and acquaintance with John Alford and from my knowledge and acquaintance with his reputation I know that he was a man who was calculated to carry a threat into execution if he made it. I did believe that John Alford entertained such feeling towards me as that he wanted to kill me, and I did so believe at the time of this difficulty. When these men that I speak of told me that Alford had threatened to kill me I believed that they told me the truth. When Alford started towards me and I pulled out my knife he says, 'I see you have got a knife, put it up and I will whip you,' and I told him that I knew he could but that I had the knife to keep him from whipping me and that I wasn't going to put it up, and he walked up facing me—Mr. Jones was on my right hand, and he walked up and hit me in the breast with his hand, and says, 'You cowardly son-of-a-bitch, I will give you the knife and whip you,' and he grabbed at my throat with his right hand and I hit at him with the knife. When I hit at him I hit him, I think, above the elbow in the muscle of the arm. After that time we moved about. John crowded me and I was afraid for him to get hold of me and I backed out of his way.

The reason I was afraid for him to get hold of me was that he was so much better man than I was that I knew if he got hold of me he could do anything he wanted to with me. I did not know that he did not have a weapon. I thought he did. I thought by him coming onto me with my knife in my hand that he was armed. Mr. Alford was a good man physically, he would weigh about 185 or 190 pounds, probably 200. At that time I had knowledge and had seen Mr. Alford demonstrate that he was a man of great physical ability, and I knew that he was a heap better man than I was because he had whipped me once and I had seen him knock ever so many fellows down. I had known of him using a weapon, a sixshooter. I had heard of him killing a man. At the time I struck Alford with the knife my purpose in using it was to keep him from killing me. During that fight I think I backed about forty feet. It is a little hard to tell how that fight progressed and what I did and what Alford did. We were both doing our best so far as that is concerned and I was backing out of John Alford's way, and we backed down by the side of the depot and John ran into me and we clinched and when he clinched me I cut him in the side, of course, I can't say just where, and in the neck. When he clinched me he was standing up. He run at me and throwed his arms this way and his left arm went under my right arm and his right arm over my left arm with his head sort of in my breast and I just struck him as he ran into me and cut him in the side and back of the neck—somewhere in the side. When Mr. Alford fell he was kicking at me. He just fell down, went down and back, with his feet up. After he fell I did not cut him."

Appellant was supported in his statement by several witnesses that deceased attacked him and he was backing off from deceased while he was cutting him, and did not cut him after he fell; while a number of witnesses for the State testify that deceased did not attack defendant, but that when deceased remarked if he (defendant) would put up his knife he could whip him, appellant made the attack with his knife, and followed deceased as he backed off and cut him while he was down.

The knife used by appellant was shown to be a springback knife, with a blade from two and one-half to three inches long, while deceased is shown to have been unarmed and in his shirt sleeves.

As almost the entire motion of appellant is an attack on the charge on self-defense and the charge on threats, we herein copy that part of the charge:

"Upon the law of self-defense the jury is instructed that when a person is unlawfully attacked by another in such a manner that there is created in the mind of the person so attacked a reasonable expectation or fear of death or of serious bodily injury, then the law excuses or justifies such person in resorting to any means at his command to prevent his assailant from taking his life or from inflicting upon him any serious bodily injury; and it is not necessary that there should be actual danger as a person has a right to defend his life and person

from apparent danger as fully and to the same extent as he would had the danger been real, provided he acted upon a reasonable apprehension of danger as it appeared to him as viewed from his standpoint at the time; and in such case the party acting upon such real or apparent danger is in no event bound to retreat in order to avoid the necessity of killing his assailant.

"If you believe the deceased attacked the defendant in such a manner that it reasonably appeared to defendant as viewed from his standpoint at the time considering all the facts and circumstances within his knowledge, or the relative strength of the parties, that he was in danger of losing his life, or suffering serious bodily injury at the hands of deceased at that time, and that defendant killed deceased under such reasonable apprehension or fear of death or serious bodily injury (if any such apprehension or fear he had) or if you have a reasonable doubt as to whether he killed him under such circumstances you should find the defendant not guilty.

"When a person accused of murder seeks to justify himself on the ground of threats against his own life he is permitted to introduce evidence of the threats made, but the same shall not be regarded as affording a justification for the killing, unless it be shown that at the time thereof the person killed, by some act then done, manifested an intention to execute the threats so made. And if the person accused had been informed that the deceased had made such threats, and believed it was true, it would be immaterial whether in fact the deceased had or had not made them.

"If you believe that John F. Alford had made statements to defendant indicating that he would do him bodily harm, or that defendant had been informed by others before the homicide that said Alford had made threats to kill defendant, and that defendant believed it was true, and if you further believe that at the very time defendant killed deceased (if he did) the said Alford did some act which viewed from defendant's standpoint appeared to him to indicate or manifest an intention on the part of deceased to carry such threat or threats into execution, and that defendant then cut or stabbed deceased and killed him, or if you have a reasonable doubt as to whether he killed him under such circumstances, you should find the defendant not guilty.

"If you find that defendant cut or stabbed deceased more than one time, and you find that he was justified under the law of self-defense or threats in inflicting the first wound, you are further instructed that under the law he had the right to continue to cut or stab him as long as it reasonably appeared to him to be necessary to protect his life or person from danger.

"Although you may believe that deceased had made statements to defendant indicating that he would do him bodily harm, or that defendant had been informed that deceased had made threats to take defendant's life, yet if you find from the evidence beyond a reasonable doubt that at the time defendant attacked deceased with a knife (if

he did) that deceased had not done, nor was doing any act, which reasonably appeared to defendant as viewed from his standpoint at the time to indicate or manifest an intention on the part of deceased to then carry such threat or threats into execution, then in such event the defendant can not justify himself on the ground of threats against his own life; and if you find from the evidence beyond a reasonable doubt that at the time defendant commenced to cut or stab deceased with a knife (if he did) that deceased had not made, nor was making an attack upon him in such a manner as that it reasonably appeared to defendant as viewed from his standpoint that his life or person was in danger, then the defendant could not justify himself on the ground of self-defense."

Appellant contends that the evidence showed threats communicated to defendant and threats made by deceased which were uncommunicated, and the court should have given in charge specifically the law as to both communicated and uncommunicated threats. Appellant requested the court to charge the jury:

"If you believe from the evidence that the deceased John Alford had made threats to take the life of defendant, or to do him serious bodily harm, and that such threats were made by the deceased in the presence of Jeff Davis and Zanger Tomlin and Charles McKnight and Tom Williams and John LaFevers and Carter Scoggins and Dr. F. M. Pitts and W. H. Wilmore, or either of them, then you will take such threats into consideration in determining whether the deceased or the defendant was the aggressor in the difficulty which resulted in the death of John Alford." Again that such threats should be taken "into consideration in determining the state of defendant's mind at the time of the difficulty." In connection with the court's charge on manslaughter, the court instructed the jury:

"If you believe the deceased had threatened in defendant's presence to do him bodily harm, or that other persons had informed defendant that deceased had made threats to kill him, defendant, and that defendant believed such information to be true, whether it was true or not; and that at the time of the killing or immediately before it, the deceased had told defendant he could whip him, or denounced him as a coward, or had done any other thing, or said any other words to defendant, which considered either alone or collectively, or in connection with any previous trouble (if any) between defendant and deceased, or in connection with any previous statement (if any) made by deceased to defendant indicating that he would do defendant bodily harm, or in connection with any threats which defendant had previously been informed deceased had made to take his life (if he had been so informed), if from any or all of such things, or from all of the facts and circumstances in evidence, there was produced in defendant's mind such a degree of anger, rage, sudden resentment or terror as rendered it incapable of cool reflection, and you further believe that such conditions or circumstances (if they existed) would

have produced such state of mind in a person of ordinary temper, and that while in such condition of mind (if he was) the defendant cut or stabbed deceased with a knife and thereby killed him, then there would be 'adequate cause' to reduce the killing to manslaughter, if you find that such killing was unlawful."

This and other portions of the charge on manslaughter fully instructed the jury that they should take into consideration all threats communicated to defendant and other facts and circumstances in evidence, in passing on the state of defendant's mind, and there was no error in refusing the special instructions insofar as they relate to that theory of the case. However, it is insisted that in the charge to the jury, in regard to uncommunicated threats, is not specifically instructed that they should be considered in passing on who was the aggressor in this case, deceased or appellant. In a proper case, where a jury must determine from the acts and conduct of the deceased, if it appeared to the defendant, as viewed from his standpoint, that the deceased was then and there about to attack him and acting on such apparent danger, he killed deceased, such is the law and should have been given. But the law should only be given as applicable to the evidence in each case, and in this case there was no evidence calling for this character of a charge. Appellant and all his witnesses testify to an absolute assault, and seek to justify on an actual assault and apparent danger from the assault. The State's witnesses testify that deceased made no assault, and did no act manifesting an intention to do so; on the other hand, he said only "I can and will whip you if you will put up your knife," when appellant said, with an oath, "Do it," and began cutting on him. How a charge on uncommunicated threats would aid the jury in determining which set of witnesses were speaking the truth, we fail to see. As before stated, there was no conduct or act of deceased, short of an attack, testified to by any witness which could or would lead defendant to believe he was about to assault him, if in fact he made no assault. At the request of appellant the court instructed the jury:

"If you believe from the evidence that the deceased was a man of superior strength to defendant, and that by reason of such superior strength he was regarded by defendant as able to do him serious bodily injury or kill him without arms, and that deceased was unarmed, and defendant knew of said fact, if it was a fact; and further believe from the evidence that said Alford assaulted defendant, or by his words or acts produced in the mind of defendant a reasonable apprehension or fear of assault, or if you believe from the evidence that defendant had been informed that deceased had threatened to kill him or do him serious bodily harm, and that at the time of the difficulty deceased did some act manifesting an intention to execute such threat, or threats, and that said act produced a reasonable apprehension in defendant's mind that deceased was about to execute said threat, defendant had the right to defend himself with all necessary force, viewing the mat-

ter from his standpoint in the light of all the surrounding facts and circumstances, including the character and reputation of deceased."

"In a criminal case the burden of proof never shifts to the defendant, and in this case the burden of proof remains upon the State throughout the case to prove an unlawful killing, and the burden does not, under any circumstances, shift to the defendant to prove his innocence."

These charges, together with the court's main charge, sufficiently presents every theory of defendant's defenses, and that no harm could have or did result to defendant in failing to give any of the special charges requested, is manifest in the verdict of the jury, they finding him guilty of manslaughter only. The deceased in this case was in his shirt sleeves. The State witnesses say he told the defendant he was unarmed, but defendant says he did not hear him say so, but thought he was armed, but even he testifies to no act or demonstration that could or would lead one to believe that deceased was about to draw any weapon of any character. His testimony and the testimony of witnesses in his behalf, show only that deceased made an assault on him with his naked hands; all the evidence shows that defendant received a bruise of no character. The court in his charge told the jury, if the deceased was a man of such strength as to lead defendant to believe that from such assault, as testified to by appellant and his witnesses, defendant believed his life was in danger, or he was in danger of suffering serious bodily injury, he should be acquitted. This was as favorable as any evidence in the case authorized, or justified.

5. Neither did the court err in not submitting the issue of aggravated assault under the evidence. The evidence showed that the instrument used was a spring-back knife with a blade two and one-half or three inches in length, and a physician with it in his hands, testifies: "It (the knife) is a deadly weapon," and no witness testifies that it is not a deadly weapon, or to any state of facts which would render it other than a deadly weapon. Appellant in his testimony says, he tried to keep from killing deceased, but testifies to no state of facts which would reduce the offense to an aggravated assault. He says, in cross-examination: "I was mad at him when I killed him. If malice means to be mad at him I killed him with malice in my heart, I hated him. When I said no son-of-a-bitch could run over my boy I was talking about John Alford or anyone else that would try it. When I said that I had John Alford in mind and no one else at that time, I just said no son-of-a-bitch and John Alford has just done it." A witness for the appellant on cross-examination said: "Alford (deceased) and Carver (defendant) were about the same height. Alford would weigh about 180 or 190 pounds; Carver was about the same size when the killing occurred." Taking the testimony as a whole, there is no evidence which called for a charge on the issue of aggravated assault.

6. There are many other assignments of error in the motion for

a new trial, but they all hinge around the propositions that the court committed error in the charge given on threats, and the failure of the court to give special charges requested both on communicated and uncommunicated threats, and the right of defendant to act on apparent danger as well as actual danger.

As we see this case, take as true all the testimony of defendant and the witnesses introduced by him, their evidence would make the defendant guilty of the offense of which the jury found him guilty. A man in his shirt sleeves, according to their testimony, attacks defendant; he does not draw nor attempt to draw a weapon, but if their statements are true, fights with his fists and hands alone; he inflicts no injury of any character or kind on defendant. It may be that he tried to do so, but we do not think it the law of this State that one man can kill another who attacks him with his naked hands, unless it should be shown there was such disparity between the size and strength of the two persons that one could and probably might inflict death by the use of his hands. In this case the evidence does not show any such disparity in strength and size, and yet the court submitted that issue to the jury for their determination, in the special charge given at appellant's request. The Legislature has made it the law of this State that for an error or an omission in the charge, we must not reverse a case, unless in our opinion such error was calculated to injure the rights of the defendant, and as we read the evidence, no verdict other than the one that was rendered by the jury, could or should have been rendered, if they believed the evidence offered on behalf of defendant. If the testimony offered on behalf of the State had been taken by the jury as a whole, it would have supported a verdict of murder in the second degree.

There being no error that could have resulted in injury to the appellant, the judgment is affirmed.

*Affirmed.*

### ON REHEARING.

#### June 19, 1912.

HARPER, Judge.—Appellant has filed a lengthy motion for rehearing and an able brief thereon, and we have taken time to again carefully study the record and the propositions advanced by appellant; also to read the many authorities cited by appellant.

His contention that one has a right to defend against any character of assault upon him will not be questioned by us, therefore, we deem it unnecessary to discuss the numerous authorities cited, upholding the doctrine that one has a right to act in defense of his person when wrongfully assailed. However, the law is different if one brings on the difficulty, or is the aggressor, or the difficulty is one engaged in by mutual consent. That part of the original opinion wherein we said: "As we read the evidence, no verdict other than the one that was

rendered could or should have been rendered, if they believed the evidence offered on behalf of defendant," is most vigorously assailed, and it is said that this must indicate that the court did not consider the issue of self-defense in the case. To determine whether the defendant had the perfect right of self-defense and thus justify his conduct, or only had what is termed the imperfect right of self-defense, which would not justify but only reduce the grade of offense, we must take the testimony offered in his behalf, for by this it is to be determined whether or not any given defensive issue is in the case. The defendant himself testified that the difficulty began thus: That at the depot his boy and Hilrey Barnett were having trouble over a suit case, both having hold of it. That he asked Mr. Alford, the deceased, who got it first, and being informed that Hilrey had done so, he caused his son to turn it loose, when his son said, "Papa, I got it first." After the train left he was talking to Mr. Shelton about this matter and Mr. Alford came by and said something to him. At the time he was talking to Shelton he did not know where Mr. Alford was until he spoke; that he thought Alford had walked out toward the stable, and when he spoke was the first time he knew he was there. He says he told Mr. Shelton he was not going to let no son-of-a-bitch run over his boy—that they could run over him but could not run over the boy. Alford asked him if he was insinuating that he (Alford) was a son-of-a-bitch, and remarked, "if you say I am a son-of-a-bitch, I will whip you in God's holy minutes," starting towards him. That when Alford started towards him he pulled out his knife, and Alford said, "I see you have a knife, put it up and I will whip you." That he told Alford he knew he could do that, but had the knife to keep him from whipping him and that he was not going to put it up, when Alford hit him in the breast with his hand and said, "You cowardly son-of-a-bitch, I will give you the knife and whip you," and grabbed at his throat when he cut him. That is the way he details the beginning of the difficulty on direct examination. On cross-examination he said: "I was mad at John Alford when I killed him. If malice means to be mad at him I killed him with malice in my heart. I was mad at him and I had been mad at him for sometime. When I told Bankston that I didn't want to get into trouble with John Alford because I owed the First State Bank seven or eight thousand dollars I was mad at Alford. I had malice and enmity in my heart towards John Alford then and I had both when I killed him. I hated him. When I said no son-of-a-bitch could run over my boy I was talking to Shelton, and I was talking about John Alford or any one else that would try to do it. When I said that I had John Alford on my mind and no one else at that time. I can't name any one else I had in mind when I said that. I just said no son-of-a-bitch and John Alford had just done it. He was the only man I had on my mind when I made that remark to Ed Shelton."

Thad Jones, a witness for defendant, testified: "As near as I can

recollect, what Carver said, was, 'Anybody can run over me but no damn son-of-a-bitch can run over my children,' and Alford said, 'You don't insinuate that I am a son-of-a-bitch or anything like that, do you,' and then he saw the knife and when he saw the knife he says, 'Carver, put up that knife,' and ·Carver says, 'John, I can't do it,' and Alford says, 'You dirty coward, you haven't got nerve enough to use it, put it up and I will beat hell out of you,' and Carver says, 'I can't do it, I can't fight you fair,' and I had my left hand on Carver's right shoulder and Alford advanced and grabbed Carver that way and says, 'You God damn son-of-a-bitch, I will whip you and give you thirty ·knives,' and they began to fight." On cross-examination he testified: "The first man I heard talking at the beginning of that difficulty was Carver, and I testified that I did not know what he said but that I knew he meant trouble. I knew he was mad at somebody and it seemed like he meant to have trouble. I heard Newt Carver say no son-of-a-bitch could run over his children. Before I heard Carver say that he and Alford had been passing words back and forth. They never did quit talking from the time he started until the fight began. From the time that Newt Carver said no son-of-a-bitch could run over his children they never had quit talking back and forth. Alford was close to Carver when he said that and the controversy was then going on. John had not gone off when Carver said that—had not left there, he was right there and Carver was talking to him before he made that remark. That. was not the first abusive language that had passed between either one of them, abusive language had been passing all along. Both of them had used curse words before that time, but that was the first son-of-a-bitch that I heard ' passed and Carver passed it and at the time he passed it he was then engaged in a controversy with Alford and John Alford's reply was that he must not insinuate that he was a son-of-a-bitch and when he said that he walked up closer to Carver. I did not see Carver get his knife, but he had it in his hand open at that time and I saw it. After that I did not hear Alford say anything about not being armed. It is not true that Carver shoved me back. I had hold of Carver, I don't know how he got loose, but when they went together both of them knocked me out of the way. I don't know which one of them hit the first lick, after Alford grabbed at him they went together. I don't know whether Carver said, 'God damn you, do it,' or not. He said something to that effect. My best recollection is that that is what he said. I saw blood there next morning from right about where the fight began to the place where Alford fell."

Ed Shelton, a witness for defendant, testified: "I was present at the Cotton Belt depot on the night of the 11th of July last when a difficulty took place between Newt Carver and John Alford and I heard and saw a part of that difficulty. I had come in on the Cotton Belt train from Waco that night. The first time I noticed Mr. Carver I saw him go up to where a lady was and directly he came back. He

went only a short distance, something like twenty or thirty feet. At that time all the persons I noticed right there was Thad Jones, Mr. Carver and myself. After Mr. Carver had been up to the lady and come back he made the remark that there wasn't no son-of-a-bitch going to run over his children and he was nearer to me than he was anybody else and I didn't know but what he meant me or anybody else. Alford was there when he made that statement, something like fifteen or thirty feet away. When Carver said that Alford told him if he was throwing that at him, by God he wouldn't take it and he walked up to Newt from where he was standing. When he walked up to Newt he commenced cursing him and I don't remember what he did say. He told him that he saw he had a knife and called him a God damn son-of-a-bitch and told him he didn't have nerve enough to use it and to put it up and he would fight him fair and Carver told him no, he wouldn't fight him and would not put the knife up and then Alford told him he could whip him if he did have a knife and went on to curse him and told him he didn't have nerve enough to use it and that he would whip him in less time than it takes to tell it and sort of shoved Newt Carver in the breast and when he did that Thad Jones had hold of Carver's left arm and when he told him he would whip him in less time than it takes to tell it Carver told him to do it and jerked loose." On cross-examination he testified that just before they went together Alford told Carver to put up the knife, and told him he could whip him anyway, when Carver said: "God damn you, do it." He further testified that he was a partner of Carver and went away with Carver and left Alford lying on the ground. This is the testimony of defendant as to the beginning of the difficulty.

The defendant proved numerous threats made by deceased, and the record discloses in the testimony for the State and defendant that the feeling of each toward the other was exceedingly bitter, and had been for some time.

Bob Horn, a witness for the State, testified: "I noticed the boys standing there pulling at the grip and I went in to the express office and when I came out I heard John Alford say, 'you needn't insinuate I am no damn son-of-a-bitch.' I don't know who he was talking to. The remark I first heard was: 'I am not going to be run over by no damn son-of-a-bitch.' Carver said that, and I don't know what else passed. I walked on out to those posts there and they were squabbling. I couldn't hear what they said, and Jones and Shelton were talking to them and trying to get them not to have any racket. So John Alford said, 'Carver, put up that knife and I will whip you in forty seconds,' and Carver ran his hand down and I saw he had a knife in his hand about that long (two and one-half inches). John Alford says, 'Carver, do you know what I think about you? I think you are the dirtiest coward that ever walked down the streets of Hubbard City,' and when he said that Newt commenced cutting at him and John threw up his hand and they were fighting until John's

heel caught on the rail and he fell backwards and Carver jumped on him and stabbed him twice and Jones ran up and caught him."

Fred Rice, a witness for the State, testified: "I was present at the Cotton Belt depot in Hubbard City at the time the difficulty came up between N. M. Carver and John Alford. The first thing I heard there that night between them was Mr. Carver saying 'I am not going to have Barney run over if I have to kill every son-of-a-bitch in Hubbard.' And Mr. Alford said there was nobody trying to run over him, and Mr. Carver said he had been run over as long as he was going to be. Mr. Carver said that Hilrey had tried to take a grip away from Barney over here this evening. Mr. Alford said, 'I don't know anything about that, I wasn't over here,' and Mr. Carver said he wasn't either but he knew Hilrey tried to do it and Mr. Alford said, 'You don't mean to call me no damn son-of-a-bitch,' and Mr. Carver pulled his knife out of his pocket and held the knife down to his side, and Mr. Alford says, 'I see you have got a knife, you know that I haven't got a thing, put up that knife and I will whip you fair.' He says, 'I think you are the dirtiest coward that ever walked down the streets of Hubbard, and if you will put up that knife I will whip you in thirty-seven spaces.' He said he didn't have a thing and when he said that Mr. Carver made a run at him and says, 'Do it, God damn you, do it,' and commenced cutting him."

Other witnesses for the State testified to substantially the same thing, and the res gestae statement of deceased will be found in the original opinion, being detailed by Dr. Dunn.

Under such state of facts what is the law of this State? In Logan v. State, 17 Texas Crim. App., 59, Judge White says: "If the defendant voluntarily engages. in a combat, knowing that it will or may result in death, or some serious bodily injury which may probably produce the death of his adversary or himself, or by his own wrongful act brings about the necessity of taking the life of another to prevent being himself killed, he can not say that such killing was in his necessary self-defense; but the killing will be imputed to malice by reason of the wrongful act which brought it about," citing 44 Texas, 356, in which Judge Moore says: "It is manifest, though an attack was made by deceased upon defendant, if such attack was occasioned by his own wrongful acts, that appellant can not be held to have acted in self-defense in resisting it."

In this case the first thing that is said or done that occasions the conflict, appellant admits and all the witnesses state, was the remarks of appellant "that he was not going to let no God damn son-of-a-bitch run over his boy." Appellant says he did not know where deceased was at that time, but admits that he was speaking of deceased, was mad at him. His witness Jones, however, contradicts him. He further says that when Alford asked him (appellant) if he was insinuating that he (Alford) was a son-of-a-bitch, he runs his hand in his pocket and takes out a spring-back knife which witnesses describe, and

when Alford caught hold of his collar, he cut him with a knife. Applying the rules of law above announced to this recital of facts by defendant, can he claim the perfect right of self-defense? Was he in no wrong? Were not his words and acts the cause of the fatal conflict? If so, the laws says if he entered into the conflict with the intention to kill he would be guilty of murder; if at the time he had no intention to kill, but was driven to the necessity of taking life to save his own he would be guilty of manslaughter.

In Reed v. State, 11 Texas Crim. App., 517, Judge White says: "But the right of self-defense, though inalienable, is and should to some extent be subordinated to rules of law, regulating its proper exercise, and so the law has wisely provided. It may be divided into two general classes, to wit: perfect and imperfect right of self-defense. A perfect right of self-defense can only obtain and avail where the party pleading it acted from necessity, and was wholly free from wrong or blame in occasioning or producing the necessity which required his action. If, however, he was in the wrong—if he was himself violating or in the act of violating the law—and on account of his own wrong was placed in a situation wherein it became necessary for him to defend himself against an attack made upon himself which was superinduced or created by his own wrong, then the law justly limits his right of self-defense, and regulates it according to the magnitude of his own wrong. Such a state of case may be said to illustrate and determine what in law would be denominated the imperfect right of self-defense. Whenever a party by his own wrongful act produces a condition of things wherein it becomes necessary for his own safety that he should take life or do serious bodily harm, then indeed the law wisely imputes to him his own wrong and its consequences to the extent that they may and should be considered in determining the grade of offense which but for such acts would never have been occasioned."

In Peter v. State, 23 Texas Crim. App., 687, Judge Hurt approvingly quotes from these decisions, as does Judge Davidson in Carter v. State, 30 Texas Crim. Rep., 656, and both said it was the law as laid down in those cases. Again in Polk v. State; 30 Texas Crim. Rep., 658, Judge Hurt, in discussing a case similar to this, holds that "to concede to the fullest extent the witnesses for the defense gave the correct version of the facts in the case, nothing less than manslaughter could have been the result from an honest jury." See also Casey v. State, 50 Texas Crim. Rep., 392; Sanders v. State, 50 Texas Crim. Rep., 430; Parnell v. State, 50 Texas Crim. Rep., 425; Pedro v. State, 48 Texas Crim. Rep., 407; Brownlee v. State, 48 Texas Crim. Rep., 412; White v. State, 23 Texas Crim. App., 164; Young v. State, 41 Texas Crim. Rep., 446; Beard v. State, 47 Texas Crim. Rep., 50; Lahue v. State, 51 Texas Crim. Rep., 163; Keeton v. State, 59 Texas Crim. Rep., 316, 128 S. W. Rep., 413, and cases cited therein. But it may be insisted that as appellant says he did not see deceased when he used the language, "God damn son-of-a-bitch," he could not have

intended to provoke a difficulty of any character in using it. If we concede that he did not know Alford was in hearing of his words, which is not a fair conclusion from all the evidence, but to give the utmost strength to his contention, yet when Alford asked if he meant to insinuate that he, Alford, was a son-of-a-bitch, appellant admits he does not disclaim but instead draws a knife, and when, as he says, deceased assaulted him, he readily entered into the conflict and cut until he killed. To admit that deceased was a violent and dangerous man, had threatened appellant, and was a man calculated to carry such threats into execution, and that appellant knew all these facts, the more reason it was why, when asked if he meant by the language used to insinuate that deceased was a son-of-a-bitch, to have said no, if he did not mean deceased, if he had no reference to him, and there would have been no conflict and no death. On the other hand, appellant on the witness stand admits that he had reference to deceased and hated him, and when he asked the question, promptly drew the knife, and our law says that the use of any dangerous weapon or semblance thereof, in an angry or threatening manner, with intent to alarm another, comes within the meaning of an assault. Had deceased killed appellant, the drawing, opening and exhibition of this knife, with the state of feeling existing between them, it would be claimed that he acted in self-defense when he struck him, and certainly two men engaging in a combat, both can not have acted in self-defense. Our conclusion is that under the peculiar facts of this case, taking into consideration the state of feeling between them, and their previous acts and conduct, neither can justify their conduct on the ground that they were acting in self-defense, for it certainly can not be said that neither had been guilty of no wrong under the evidence. And it further appears that when appellant knew deceased had heard the language he used, he made ready to fight, and entered into it with zeal as soon as deceased struck him first, if he did do so, as contended. In the case of King v. State, 13 Texas Crim. App., 283, Judge Willson says: "Whenever a party, by his own wrongful act, produces a condition of things wherein it becomes necessary for his own safety that he should take life or do serious bodily harm, then, the law wisely imputes to him his own wrong and its consequences to the extent that they may and should be considered in determining the grade of offense, which, but for such acts, would never have been occasioned."

In the case of Pollock v. State, 32 Texas Crim. Rep., 32, in which the facts as recited show the appellant in that case was approached by Chas. Moody and told he had to take back what he had said, which he agreed to do if another would also do so. He says he was then asked if he had called John Moody a son-of-a-bitch, and, answering in the affirmative, he was struck, and they fought, appellant saying he did not want to fight. In applying the law to the facts in that case Judge Davidson says: "Looking to the evidence, the defendant, though reluctantly, entered into the combat with some zeal, was rough in his

remarks, and vigorous in his efforts during the fight. In this attitude it is immaterial who struck the first blow, for both are guilty of an affray. Self-defense is ·not an issue, and defendant could not justify his action on the ground that he did not strike the first blow."

So in this case, while it may be said to be an issue who struck the first blow, the State's testimony having appellant make the first blow with a knife, and following deceased up as he retreated, yet by his testimony he admits he used insulting language in regard to deceased, 'and when asked if he meant to apply it to deceased, gets his knife out in his hands, and when struck with the naked hands, strikes back with a knife and continues to do so until deceased falls. Appellant's language was the moving cause at least to a war of words, and then the exhibition of his knife was the provoking cause for an immediate conflict, which he readily entered into, and this being true, we think there was no self-defense in the case, and taking that view, it becomes immaterial whether or not the court properly presented the law as to uncommunicated threats, for we hold that it was appellant's words and conduct on that occasion, viewing it from the standpoint as presented by the testimony introduced in his behalf, that was the provoking cause of the immediate conflict, and it is only in a case where one has the perfect right of self-defense that the law of uncommunicated threats, as they might shed light on who began the difficulty, would be material. And the same might be said as to the court not permitting additional witnesses to be introduced as to deceased being a person of violent and dangerous disposition and one likely to carry a threat into execution. The more dangerous a man, the less excuse there would be for one to use language and conduct himself in a way that he would know, from the nature and disposition of the man, that his words and conduct would produce a difficulty. A man in law is held responsible for his acts and if he expects to claim justification, the record should disclose that he is guilty of no wrong. At least, the failure to permit additional witnesses to be introduced as to the character of deceased would not present reversible error, as he was found guilty of manslaughter only, there being no right of perfect self-defense in the case. However, the court submitted the issue of self-defense, as shown in the original opinion, in a very favorable way, and having done so, certainly the matters complained of, as we view the case, present no reversible error.

The other questions being so fully discussed in the original opinion we do not deem it necessary to do so again.

The motion for rehearing is overruled.

*Overruled.*