HENRY BOWLIN v. THE STATE.

No. 6418.    Decided November 1, 1922.

Rehearing Denied February 21, 1923.

#### 1.—Murder—Manslaughter—Charge of Court—Insult to Female Relative.

Where, upon an appeal from a conviction of murder, appellant contended that the issue of murder should not have been submitted and claimed adequate cause for insulting conduct by the deceased to defendant's wife, but the evidence showed that there was a conflict of testimony with reference to the first meeting of the parties after the alleged insult was communicated to the defendant, and also an issue of fact as to whether defendant's mind was incapable of cool reflection at the time of the homicide, there is no reversible error, and the question of murder was correctly submitted to the jury.

#### 2.—Same—Bill of Exceptions—Charge of Court—Practice on Appeal.

Where appellant contended that the court should not have submitted the issue of murder because the killing was at most manslaughter, but the bill of exceptions failed to show that the objection to the court's charge, so far as it related to murder, was made in writing the same could not be considered; however, the same question however arising under the contention that

the evidence did not support the verdict for murder the question is thus raised on appeal.

**3.—Same—Manslaughter—Insult to Female Relative—Charge of Court.**

Where, upon trial of murder, the State's evidence showed that defendant had ascertained where deceased was at work, that he twice that day passed near the place; that on one occasion he saw deceased and was within fifty yards of him; that defendant's conduct was not that of a man swayed by passion which rendered him incapable of cool reflection, etc., the court properly submitted the issue of murder together with that of manslaughter.

**4.—Same—Rule Stated—Adequate Cause—First Meeting—Insult to Female Relative.**

Though homicide be on the first meeting after insult was known to defendant, yet if his mind was capable of cool reflection it is murder, and the existence of adequate cause alone will not reduce an unlawful homicide to manslaughter, and when the statutory adequate cause of insulting words or conduct of deceased toward a female relation of the slayer is in evidence the question whether the homicide was on passion is a proper subject of inquiry for the jury; following Squyers v. State, 242 S. W. Rep., 1024.

**5.—Same—Manslaughter—Charge of Court—Insult to Female Relative—Article 743, C. C. P.**

Where, upon trial of murder, there were no facts in evidence upon which adequate cause could be based other than insult to defendant's wife the criticism of the court's charge in submitting other causes should have caused them to have been eliminated from his charge, but where the same was not calculated to injure the rights of the defendant under a fair construction of Article 743, C. C. P., and was not of a character that the defendant had not in some other respect had a fair and impartial trial the judgment will not be reversed, under the main charge of the court and the requested charges of the defendant in the instant case. Distinguishing Ataway v. State, 41 Texas Crim. Rep., 395; Squyres v. State, 242 S. W. Rep., 1024.

**6.—Same—Requested Charge—Practice on Appeal.**

Where, upon trial of murder, in so far as applicable, the matters presented in requested charge had already been covered, either in the main charge or special charges given, there was no reversible error.

**7.—Same—Evidence—Good Reputation—Practice in Trial Courts.**

Where, upon trial of murder, the appellant claimed that the court refused to permit him to prove by a number of witnesses his general good reputation, but it appeared from the record on appeal that when these witnesses were tendered the State admitted that appellant's reputation was good and that the witnesses would so testify, there was no reversible error. Following Carver v. State, 67 Texas Crim. Rep., 116, and other cases.

**8.—Same—Witnesses Under Rule—Discretion of Court.**

Where appellant called for the rule, but requested that the character witnesses, naming them, be excused, to which counsel for the State objected and the court made the rule apply to all witnesses this was within the discretion of the trial judge.

**9.—Same—Witness Under Rule—Discretion of Court.**

Where it appeared from defendant's bill of exception that after all of the witnesses had been called, sworn and instructed by the court, with reference to the rule, counsel representing the State observing the mother of appellant sitting by him in the courtroom immediately had process issued for her and had her placed under the rule, but the bill of exceptions being qualified that the court was not informed that said witness would not be used, there was no reversible error.

**10.—Leading Questions—Practice on Appeal.**

Conceding that some of the questions, asked the witness, were of a leading character, yet the bill not showing that they were of that character which this court has always required to be shown before a case would be reversed on account of leading questions, there was no reversible error.

**11.—Same—Evidence—Letter—Bill of Exceptions—Practice on Appeal.**

Where the bill of exceptions shows that while a State's witness was testifying in rebuttal, an inquiry with reference to the letter claimed to have been secured by the defendant on the day of the killing was made, she was asked if there was not a difference in the writing of certain words and the remainder of it, there is no reversible error; besides the bill omits to state what the answer of the witness was, and moreover the question was withdrawn.

**12.—Same—Argument of Counsel—Practice in Trial Court.**

Although the conduct of counsel representing the State was improper in turning to a State's witness and asking her during his argument whether he was not right, to which she replied in the affirmative, yet this error was relieved of any harmful effect by the court withdrawing the argument immediately from the jury, and his refusal to otherwise condemn the incident by reprimanding the counsel is not reversible error.

**13.—Same—Argument of Counsel.**

Where the objection to the argument of State's counsel was that it was an expression of an opinion not properly deducible from the evidence and prejudicial to defendant, but viewing the matter in the light of the entire record this court cannot regard the argument complained of as improper, there was no error.

**14.—Same—Argument of Counsel—Bill of Exceptions.**

Where the defendant objected to the closing argument of the State's counsel and by his exhibiting the letter to the jury, requesting them to note a difference in the handwriting of different parts in the letter, but the bill did not certify as a fact that no such difference existed, there is no reversible error.

**15.—Same—Argument of Counsel—Questions and Answers.**

If it were necessary to read the entire bill of exceptions to appraise the complaint made against the argument by the private prosecutor, then this court must decline to consider it, as the same was in question and answer form. However, viewing the entire record, the argument was legitimate.

**16.—Same—Evidence—Harmless Error.**

Conceding that the contents of the letter deceased was writing at the time he was shot was immaterial, and that the statement made by the State's witness that the deceased and the lady in question were engaged to be married at the time was immaterial, this court cannot bring itself to conclude that the evidence was of such character as to have been prejudicial.

**17.—Same—Rehearing—Adequate Cause—Insult to Female Relative.**

Where defendant claimed that the alleged letter was written by his wife to the deceased and testified that she denied it, that his confidence in her virtue was not shaken, etc., it was not for the court to decide that the letter was written by his wife, and the law demanded that the jury under a proper charge weigh it in the light of the surrounding facts, and there was no reversible error in the court's action in submitting the charge on murder together with manslaughter.

**18.—Same—First Meeting—Manslaughter—Passion—Question of Fact.**

Assuming that defendant believed that his wife wrote the letter, that it was intended for the deceased and that defendant killed the deceased the first time he met him after the letter was read, still, the state of his mind

was a matter which the jury and not the court must determine under the evidence in the instant case, as it is not the adequate cause alone which reduces the grade of homicide but passion must result therefrom which renders the mind incapable of cool reflection. Following Eanes v. State, 10 Texas Crim. App., 421, and other cases.

### 19.—Same—Rule Stated—Insult of Female Relatives—Adequate Cause.

There are exceptional cases in which the evidence of adequate cause, the requisite passion and the slaying upon first meeting is conclusive to a degree which excludes every other theory and which makes it incumbent upon this court to refuse to sanction a verdict of murder, but the testimony of the defendant to a state of facts exculpating him or mitigating the offense is not conclusive against the State, especially where as in the instant case there are circumstances tending to contradict its truth. Following Davis v. State, 70 Texas Crim. Rep., 37.

Appeal from the District Court of Shelby. Tried below before the Honorable Chas. L. Brachfield.

Appeal from a conviction of murder; penalty, fifteen years imprisonment in the penitentiary.

The opinion states the case.

*H. B. Short,* for appellant.—On question of insult to female relative: Squyres v. State, 242 S. W. Rep., 1024; Pitts v. State, 29 Texas Crim. App., 378.

On question of argument of counsel: Stiles v. State, 91 Texas Crim. Rep., 467.

On question of court's charge on manslaughter: Eanes v. State, 10 Texas Crim. App., 445; Richardson v. State, 91 Texas Crim. Rep., 328, and cases cited in opinion.

On question of argument of counsel with reference to stating testimony not in the case and affirming same by witness in courtroom: Dugan v. State, 82 Texas Crim. Rep., 422; Puryear v. State, 50 id., 462; Lucas v. State, 50 id., 220; Christian v. State, 46 id., 47; Kincaid v. State, 65 id., 464; Wilkerson v. State, 60 id., 397.

*R. G. Storey,* Assistant Attorney General, *J. P. Anderson,* District Attorney, and *Sanders & Sanders,* for the State.—On question of adequate cause upon first meeting: Jones v. State, 47 Texas Crim. Rep., 515; Gillespie v. State, 53 id., 168; Jordan v. State, 62 id., 386; Oldham v. State, 63 id., 527; Rogers v. State, 67 id., 467; Davis v. State, 163 S. W. Rep., 442.

On question of leading questions: Hunter v. State, 59 Texas Crim. Rep., 450.

On question of argument of counsel: House v. State, 19 Texas Crim. App., 237; Himmelfard v. State, 174 S. W. Rep., 586; Mooney v. State, 176 id., 58; Fowler v. State, 232 S. W. Rep., 515; Parshall v. State, 62 Texas Crim. Rep., 177; Felder v. State, 59 id., 144; Fonder v. State, 169 S. W. Rep., 416.

HAWKINS, Judge.—Appellant was convicted of murder growing out of the killing of one Jim Richardson, and his punishment assessed at fifteen years confinement in the penitentiaray.

Richardson was killed on the 9th of March, 1920, by appellant who shot him with a gun in the night-time through a window at the home of deceased while the latter was sitting on a trunk writing a letter to a seventeen-year-old girl, the sister of appellant's wife. Deceased was a young unmarried man, twenty-eight years old. Appellant was a married man thirty-one years old. Up to the time of this killing appellant had never been charged with any violation of the law and his reputation for peace and quietude was admitted by the State upon the trial to be good. Appellant and deceased lived in the same community, and so far as the record discloses, had always been friendly up to near the date of the killing. Deceased lived with his sister. Appellant was a farmer by occupation, but occasionally engaged in trapping. Some months before the killing, appellant, contemplating being away from home for some time upon a trapping expedition, made arrangements with deceased's sister to stay with his (appellant's) wife during this absence. He was away about a month. A short time after returning appellant's brother informed him that deceased had stayed at his house a large part of the time he was absent. Appellant, fearing that such conduct on the part of deceased might give rise to some unfavorable talk relative to appellant's wife, sent word to deceased requesting him to cease his visits, and later told deceased in person the same thing. According to the testimony of appellant deceased explained his presence at his (appellant's) home during his absence by saying that appellant's wife and deceased's sister were afraid to stay there by themselves and that this was the reason of his deceased's presence in the home. Appellant appears to have accepted this explanation and told him if that was the reason for him being there it was all right but warned him of the likelihood of his conduct starting unfavorable talk in the community. On the morning preceding the homicide appellant saw his wife going in the direction of his mail box, which she passed and went on in the direction of a neighbor's residence. This excited appellant's suspicion, and he went to his mail box about the time the mail rider approached from the direction appellant's wife had gone. Upon inquiry the mail rider denied that appellant's wife had given him any letter, but permitted appellant to look through the mail which he had taken up and appellant found a letter which he claimed to be in his wife's handwriting addressed to one Richard Lambright. Appellant desired to keep the letter but the mail rider declined to let him do so, and proceeded on his way. Appellant unhitched one of his mules from the plow and without waiting to saddle it, proceeded in a nearer way than the mail rider was pursuing to the mail box of Richard Lambright intending to get possession of the letter. Upon reaching Lambright's mail box he found

some mail in it, but not the letter he was in search of. He then pro-
ceeded along the mail route making some inquiry and receiving infor-
mation as to where both deceased and Richard Lambright could be
found. Upon reaching the mail box of the deceased he claims to
have found the letter which he had seen in the hands of the mail
rider that morning. He placed the letter in his pocket and proceeded
towards home, claiming that he did not read it until after he had passed
some parties whom he saw approaching about the time he got the
letter out of the box. It is not necessary to set out the letter, but the
contents were such as to authorize appellant to reach the conclusion
that deceased had made improper advances towards his wife and alien-
ated her affections. Appellant said upon reading the letter he deter-
mined to kill deceased and proceeded to make preparations for that
purpose. On his way home he borrowed a couple of buck-shot shells
and upon reaching home asked his wife if she had written a letter
to deceased, which he says she denied. He remained at home several
hours. Late in the afternoon he took his wife and children in a wagon
and proceeded to his brother's (Tad Bowlin's) going the same route
he had traveled that morning, which took him near the residence of
deceased. Evidence was introduced from deceased's sister, who lived
with him, that as appellant and his wife passed that afternoon deceased
was approaching his house in plain view of the road appellant was
traveling and within about fifty yards at the time he passed. Appellant
had his gun but denied having seen deceased at this time. After sup-
per appellant claims to have requested his brother (Tad Bowlin) to
go to another brother's (Bale Bowlin) and secure the latter to help
him plant cane; that appellant took from the wagon the gun and
walked to the home of deceased, saw him sitting inside, fired through
the window and killed him. It may be conceded that there is an ab-
sence from the record of any evidence upon which to predicate man-
slaughter, save that of an insult to a female relative. The court sub-
mitted the issues of murder and manslaughter.

We find in the record a bill of exceptions to paragraphs 1, 2, 3, 4,
5 and 6 of the court's charge, which defines murder and malice and
embraces the general charge upon murder: The exception thereto
was that the evidence disclosed a killing which could be at most
manslaughter and that, therefore, the court should not have charged on
any element of murder whatever. The bill fails to show that the objec-
tion to the court's charge so far as it related to murder was made in.
writing. This being required specifically by Article 735 C. C. P., the
bill is not in a condition to be considered. However, the same ques-
tion arises where it is urged that the evidence does not support the
verdict for murder. We cannot agree that such position is correct.
The State contended that appellant had ascertained where deceased
was at work, that he twice that day passed near the place; that on one
occasion he saw deceased and was within fifty yards of him; that

appellant's conduct was not that of a man swayed by passion which rendered him incapable of cool reflection, but that the facts warranted the jury in concluding that he waived his opportunity to meet deceased, or if seeing him the opportunity to act, and postponed action until a time more suitable to his purpose. The State's contention is not without support in the evidence. We quote from Branch's "Criminal Laws of Texas," Section 509:

"Though homicide be on the first meeting after insult was known to defendant, yet if his mind was capable of cool reflection, it is murder."

Also from his Ann. P. C., page 1140, Sec. 2028:

"Though the homicide be on the first meeting after the insulting words or conduct of deceased toward the female relation of defendant was made known to defendant, yet if the mind of defendant at the time of the homicide was capable of cool reflection the homicide may be murder. The existence of adequate cause alone will not reduce an unlawful homicide to manslaughter."

And page 1141, Section 2029:

"When the statutory adequate cause of insulting words or conduct of deceased toward a female relation of the slayer is in evidence the question whether the homicide was on passion is a proper subject of inquiry for the jury."

The authorities will be found collated under the respective sections quoted. We also cite Squyers v. State, 92 Texas Crim. Rep., 160, 242 S. W. Rep., 1024, at page 1029, for the last expression from this court.

Many objections were reserved to the court's charge upon manslaughter, the bills of exception showing that the objections thereto were filed in writing in a timely way. In order that the objections may be properly understood when referred to later in this opinion the court's charge on manslaughter is herein reproduced.

"(8)   Manslaughter is voluntary homicide committed under the immediate influence of sudden passion arising from adequate cause but neither justified nor excused by law. By the expression 'under the immediate influence of sudden passion' is meant: (a) That the act must be directly caused by the passion at the time of the killing; (b) The passion intended is either of the emotions of the kind known as rage, anger, sudden resentment or terror, rendering the mind incapable of cool reflection. By the expression 'adequate cause' is meant that such as would commonly produce such a degree of anger, rage, sudden resentment or terror in a person of ordinary temper sufficient to render the mind incapable of cool reflection.

"(9) In order to reduce a voluntary homicide to the grade of manslaughter, it is necessary not only that adequate cause existed to produce the state of mind referred to, that is of rage, anger, sudden resentment or terror sufficient to render it incapable of cool reflection,

but also that such state of mind did actually exist at the time of the commission of the offense, and that it was produced by such adequate cause.

"(10) It is your duty in determining the adequacy of the provocation, if any, to consider in connection therewith all the facts and circumstances in evidence, and if you find by reason thereof the defendant's mind at the time of the killing was incapable of cool reflection, and that the facts and circumstances were sufficient to produce such a state of mind in a person of ordinary temper, then the proof of the sufficiency of the provocation satisfies the requirements of the law; and so in this case, you will consider all the facts and circumstances in evidence in determining the condition of the defendant's mind at the time of the killing and the adequacy of the cause, if any, producing such condition.

"(11) You are further instructed that insulting words or conduct of the person killed towards the wife of the party guilty of the homicide is adequate cause for arousing the mind to a degree of anger, rage, resentment or terror in a person of ordinary temper sufficient to render the mind incapable of cool reflection; but when it is sought to reduce the homicide to the grade of manslaughter by the reason of the existence of insulting words or conduct of the person killed toward the wife of the party guilty of the homicide it must appear that the killing took place as soon thereafter as the party killing may meet with the party killed after having been informed or in possession of the information of such insults or insulting conduct. Where there are several causes to arouse the passion, though no one of them might constitute the adequate cause, yet all the causes combined might be sufficient to do so. In this case, as to whether the homicide was committed under the influence of passion, and as to whether there was adequate cause for such passion are questions of facts for the decision of the jury.

"(12) Now, if you believe from the evidence that Jim Richardson, prior to the homicide, was guilty of insulting conduct and acts toward the wife of the defendant, and that after receiving such information of the acts and conduct of the deceased, and the defendant believing same to be true, and that so soon thereafter as the defendant, Henry Bowlin, met the said Jim Richardson, deceased, that he shot and killed him with a gun, the same then and there being a deadly weapon, and that at the time of the said meeting his mind became aroused to the degree of anger, rage, sudden resentment or terror, rendering it incapable of cool reflection, and that he then and there shot and killed the said Jim Richardson, then you will find the defendant guilty of manslaughter, and assess the proper punishment therefor, regardless of the manner in which the killing, if any, occurred. The punishment for manslaughter is by confinement in the penitentiary for not less than two nor more than five years. If from the evidence you have

a reasonable doubt that the defendant is guilty of manslaughter, you will find him not guilty."

Paragraph ten of the charge is assailed because (a) it is not applicable to any state of facts in evidence; (b) the issue presented in said paragraph is not made by any testimony in the case; (c) the evidence excluded any other reason for the killing save insulting conduct by deceased towards appellant's wife. Criticism is specially directed at that portion of the eleventh paragraph where the language is used:

"Where there are several causes to arouse the passion, though no one of them might constitute adequate cause, yet all the causes combined might be sufficient·to do so," as having no proper place in the charge under the evidence. Complaint is made at the entire ninth paragraph, and that portion of the twelfth where the jury is required to find that at the time of the killing appellant's mind was in a state of passion "rendering it incapable of cool reflection," on the ground that the evidence having shown an insult to appellant's wife, which in law was adequate cause, and the killing was at the first meeting, the issue whether appellant's mind was incapable of cool reflection as not a fact to be determined by the jury. We do not discuss the objections to the 9th and 12th paragraphs of the charge at length. If the mind of the slayer is not "incapable of cool reflection" by the terms of the statute itself the killing could not be manslaughter. (Art. 1128, 1129, 1130, P. C.) The passion must exist whatever be the cause, the only distinction being that where the killing is because of insults to a female relative the passion is not required to arise at the time of the killing. The very question was last considered by this court in Squyres v. State, supra; also, see quotations from Branch, supra, and authorities collated by him. There being no facts in evidence upon which "adequate cause" could be based other than insults to appellant's wife, the criticism of the 10th paragraph of the charge, and that part of the 12th paragraph last quoted should not have been given, and when objection thereto was called to the court's attention they should have been eliminated from the charge. Article 735, C. C. P., provides that the trial judge shall deliver to the jury "a written charge, in which he shall distinctly set forth the law applicable to the case." Article 743 reads:

"Whenever it appears by the record . . . that any of the requirements of the nine preceding articles (Arts. 735-742) have been disregarded, the judgment shall not be reversed unless the error appearing from the record was calculated to injure the rights of the defendant, or unless it appears from the record that the defendant has not had a fair and impartial trial." We believe a fair construction or the article just quoted requires the error in the charge to be of such character as "calculated to injure the rights of defendant." If the error in the charge was not of such character, yet if the record

revealed that he had not in some other respect had a fair and impartial trial surely the judgment should be reversed. To determine whether the conceded errors in the charge were calculated to injure appellant the whole charge, including those given at his request must be considered. In applying the law to the facts the court submitted no general charge including other phases of "adequate cause," but restricted it to the alleged insults. (See paragraph 10 of charge heretofore quoted.) In addition thereto he gave three special charges at appellant's request in all of which the jury were restricted to consideration of insults to his wife on the issue of manslaughter, in one of which the jury were told if the killing was upon the first meeting with deceased after appellant learned of the insult, the killing would be manslaughter "without regard to the way the killing was done." One of the special charges given was even more favorable than accused was entitled to in that it completely ignored his mental status at the time of the killing. Reading paragraph 10 of the main charge in connection with the special charges given, we would be unwarranted in concluding that the errors in the charge were calculated to injure appellant. In Attaway v. State, 41 Texas Crim. Rep., 395, to which we are referred by counsel for appellant, the court gave a general charge on "adequate cause," and submitted it that way to the jury. He then instructed generally that an insult to a female relative was adequate cause, but entirely omitted any application of that feature. This court, speaking through Judge Henderson, says:

"Why the learned judge took the pains to give an elaborate charge on 'adequate cause,' not applicable at all to the case, and instructed the jury in regard thereto, when there were no facts to authorize it was strange enough, but why he should then define an adequate cause applicable to the facts proven, and not apply the law to the facts, is inexplicable."

The Attaway case does not present an analogous situation to that in the instant case. The last time we had occasion to review the question at length was in Squyres v. State, 92 Texas Crim. Rep., 160, 242 S. W. Rep., 1024. It will be noted that in the charge there the issue of manslaughter as applied to the facts (bottom of page 1028) was submitted generally as based upon "adequate cause" in all its phases. The same is true as to the charge in Hughes v. State (No. 6762, opinion October 11, 1922). The record in that case shows the vice in the general statement of the law upon "adequate cause" not made pertinent by the evidence was also carried into an application of the law to the facts. In that respect a marked difference exists in the charge in the Squyres and Hughes cases from that found in the one now under consideration.

Complaint is made because the court refused appellant's special charges numbers 7 and 9. We deem it unnecessary to set them out. In so far as applicable, the matters presented had already been cov-

ered either in the main charge or special charges given.

By bill of exceptions 19 complaint is made because the court refused to permit appellant to prove by a number of witnesses his good reputation. When the witnesses were tendered the State admitted that appellant's reputation was good, and the court permitted the statement to be made that the witnesses tendered, naming them, would so testify. Under such circumstances no error was committed in declining to let appellant go through the formality of having them testify. Becker v. State, 80 Texas Crim. Rep., 185, 190 S. W. Rep., 185; Beard v. State, 44 Texas Crim. Rep., 402; Carver v. State, 67 Texas Crim. Rep., 116; Wilson v. State, 72 S. W. Rep., 862.

Appellant called for the rule but requested that the character witnesses, naming them be excused. Counsel for the State objected to this and the court made the rule apply to all witnesses, to which exception was reserved. This was within the discretion of the trial judge and no abuse of such discretion is shown. Branch's Ann., P. C., page 197, Sec. 224.

It appears from appellant's bill of exceptions number 21 that after all the witnesses had been called, sworn and instructed by the court with reference to the rule, counsel representing the State observed the mother of appellant sitting by him in the courtroom. She had not been called by appellant as a witness, but counsel for the State immediately had process issued for her, had her called, sworn and placed under the rule with the other witnesses. The bill asserts that it was the purpose of counsel representing the State to compel the mother of appellant to be away from him during the trial, with no intention of using her as a witness. Appellant's counsel advised the court that the mother would not be used as a witness by appellant, and was not in possession of any testimony which would be offered and requested the court not to place her under the rule. The bill of exceptions is qualified with the explanation that the court was not informed that the witness would not be used, and he ordered all the witnesses to be placed under the rule. With this explanation from the court we cannot say that his discretion with reference to the matter was abused.

Appellant's first bill of exception complains because the State was permitted to ask the witness Miss Leah Richardson, leading questions. This witness had testified on direct examination and the objection came to her examination upon being recalled by the State. Some of the questions appear to be leading, but as we understand the bill (especially in view of the brief and argument of appellant's attorneys) the particular objection was to the examination of this witness relative to the location of the deceased's house and the road along which appellant traveled the afternoon prior to the killing, the distance between where appellant was at that time and the deceased, and the view between the places. Upon that particular issue which seemed to be

vital we observe no leading question as shown by the bill. The witness, after having stated that she saw appellant and his wife passing along the road, was asked by counsel for the State the following question: "Where was Jim?" (deceased), to which she answered, "He was not at the house but he was coming to the house, I don't suppose he was over fifty yards from the road." Conceding that some of the questions asked the witness were of a leading character, it does not occur to us from an examination of the entire bill that they were of that character which this court has always required to be shown before a case would be reversed on account of leading questions. The rule will be found stated in Branch's Ann. P. C., page 90, Section 157, as follows:

"Permitting a leading question improperly will not be reversible error in the absence of a showing of prejudice thereby." Many cases are annotated by Mr. Branch in support of the rule.

Bill of exception number two shows that while Miss Leah Richardson was testifying in rebuttal an inquiry with reference to the letter claimed to have been secured by appellant on the day of the killing was made. She was asked if there was not a difference in the writing of certain words and the remainder of it. The bill omits to state what the answer of the witness was, and therefore, as to that feature presents no error which may be considered. Branch's Ann. P. C., page 134, Section 210. Upon objection being made the question was withdrawn, and the question and answer (if one was made) was ordered stricken from the record. We have been unable to discover any error in the proceeding. It occurs to us if a difference does appear in the writing it was a pertinent matter for inquiry. At any rate the withdrawal of the question, and the action of the court in striking it from the record rendered the error, if any, harmless.

A controverted issue was the distance from the house where deceased was killed to the public road, as well as the distance from the point where deceased was supposed to have been from the public road at the time appellant passed along the same on the afternoon prior to the killing. The witness, Miss Lea Richardson, who lived with deceased at his house, had testified upon this point. During the closing argument for the State, while the attorney was discussing the testimony of Miss Richardson relative to such controversy, he said: "The distance from the public road along which defendant and his family had traveled on the afternoon prior to the night deceased was killed was nearer to the pasture located at the rear of the house than the house was." When counsel made the foregoing statement he turned to Miss Richardson, who was sitting in the courtroom during the argument, and remarked to her: "Is that right, Miss Leah?" to which she replied: "Yes, sir." Appellant objected to this and the court immediately instructed the jury not to consider either the question or the answer. The conduct of counsel representing the State was un-

usual and improper, but the prompt action of the court relative there-
to, we think, relieved it of any harmful effect. The witness had
already testified to the facts upon which counsel was basing his argu-
ment and her answer to his question injected into the case no new
issue nor any additional evidence relative to an issue already before
the jury. The bill presenting this matter recites that the court refused
to otherwise condemn the incident by administering to the counsel
a reprimand. It is not made to appear from the bill that any request
that the court reprimand counsel was made, and these are matters
which must of necessity be left to the discretion of the trial court. We
must presume that as it appeared to the trial judge he did not con-
sider the conduct of that character which called for a reprimand.
No special charge was requested by counsel for appellant relative to
the incident just discussed and we are not inclined to believe it was
of that injurious character which would call for a reversal at our
hands.

Bills of exception 4, 5 and 8 also complain of the closing argu-
ment of counsel representing the State. Gus Bowlin (also called Bale
Bowlin as we understand the record) and Tad Bowlin were brothers
of appellant. Gus Bowlin had testified but Tad Bowlin, although
present had not been called to testify either by the State or appellant.
Counsel for the State stated to the jury that it was his opinion that
"Tad Bowlin had been told by defendant of his intention and went
with defendant to the place where deceased was killed, and that the
reason Tad Bowlin was not used as a witness was because he and
appellant had agreed to kill deceased and that deceased was killed in
his presence, and that Tad Bowlin would have so testified had he been
used as a witness." It is urged in appellant's brief that counsel as-
serted as a fact that deceased was killed by defendant in the presence
of Tad Bowlin and that he would have so testified had he been used
as a witness. We cannot so construe the bill, but regard the whole
matter complained of as an expression of the opinion of counsel rep-
resenting the State. We are borne out in this construction by the
reasons given in objecting to the argument, which states that they
were "based upon the ground that in the closing argument of the
State counsel should confine his argument to testimony of witnesses
who had testified and should not go out of the record by asserting
what the opinion of counsel was as to what the testimony would have
been of some witness who had not testified." Counsel also said he
believed defendant made known to his brothers Tad Bowlin and Gus
Bowlin his intention to kill deceased prior to the time he did kill him,
and further that it was his opinion that Tad Bowlin did know of
defendant's purpose to kill deceased, and that he aided and assisted
defendant in carrying out that purpose. The objection to the argu-
ment was that it was an expression of an opinion not properly de-
ducible from any evidence in the case and was prejudicial and hurt-

ful to appellant. Appellant had testified that he did not make known to either of his brothers what his intentions were towards deceased and that Tad Bowlin had nothing to do with the killing. We call attention, however, to certain contradictory statements in the testimony. Gus Bowlin, when first testifying, stated that he did not see appellant the night of the killing after the killing occurred; that the first time he saw him was the next day; that he came by witness' house that night and told him something about the killing but that he (witness) did not see him as he was in bed; that appellant called him and he got up and went to the door and appellant told him he had killed deceased, but that witness did not see him because it was dark. The witness further states: "I do not know where Tad was, I saw him the next day." Further, this witness states, "I do not recollect having asked him to come in the house, I just asked him who it was." Appellant testified that he took his wife on the afternoon of the killing and went to Tad's; that it was late in the afternoon when he got there, about four or five o'clock; that he did not stay at Tad's place very long; that he and Tad did not leave the latter's place together, that appellant left first; that he told Tad to go get his brother, Bale, to help him plant cane; that he left ahead of Tad and heard the latter say he had to get Bale to help him plant cane; that Tad was fixing to leave when appellant left. He further testified that he did not know he had fired two shots at deceased until Tad informed him the gun was empty; that he did not fire any more after leaving deceased's house until he got to Tad's. Appellant further testified that when he got to Bale's house he holloed and Bale asked him to come in; that he went in and Bale met him at the door, whereupon he told Bale he had killed deceased. He testified that Bale met him about midway of the room and that he (appellant) just handed the gun to Tad and made the remark to be careful, that it was loaded, whereupon Tad examined the gun and reported to him that it was empty. The statement of facts further reveals that when Gus Bowlin was recalled to the stand he stated that when appellant came in the house he asked him what was the matter and he said he had killed deceased. In view of the entire record and particularly of appellant's testimony that he went to the home of his brother Tad late in the afternoon preceding the killing and sent Tad to his brother Bale's and that they both left about the same time, and the further statement of Gus (or Bale) that at the time appellant came back by his house after the killing that he did not know where Tad was, in the face of the statement of appellant that he handed the gun to Tad at Bale's house, and the failure of appellant to call Tad as a witness, would not justify us in saying that counsel was unauthorized in drawing the conclusion he did and stating it to the jury. The trial court is in a much better situation to pass upon matters of that character than this court can possibly be, because he has an opportunity to see the demeanor of the witness upon the stand. The

93 T. C.—30

fact that the trial judge declined to sustain the objection to the argument must have certain weight with us, at least to the extent of concluding that the trial court believed from the entire evidence that counsel was authorized to draw the conclusion he did. It is always permissible for counsel for either side to comment on the failure of the opposing side to call witnesses which may throw light upon the transaction under investigation, and this is true although the witnesses may have been present in court and available to either party. Viewed in the light of the entire record we cannot regard the argument complained of as improper. In whatever form it may have been stated to the jury it appears to have been a conclusion deducible from the evidence and not the assertion of some new fact. It is only in extreme cases that this court would feel called upon to reverse on account of argument of counsel unless he had violated some statutory provision or injected into the case facts of a harmful character which were not in evidence. Many cases will be found collated by Mr. Branch in his Ann. P. C., page 207, under Sec. 370. It is further stated by him under Sec. 361, at page 204 that, "Before a reversal would be authorized even on account of improper argument of State's counsel that it must clearly appear that the remarks were improper and were of such a material character and such that under the circumstances were calculated to injuriously affect the rights of accused," citing many authorities in support of such proposition. We do not regard Stanchel v. State, 89 Texas Crim. Rep., 358, 231 S. W. Rep., 120, as holding contrary to the views here stated.

Appellant based his action in the killing on the letter he claims to have gotten from deceased's mail box. The envelope was addressed to "Richard Lambright," but the letter purported to be signed "From Myra to James." It was introduced before the jury by appellant. In the closing argument counsel for the State exhibited it to the jury and requested them to note a difference in the handwriting of the balance of the letter and the words "From Myra to James." Objection was urged that it was an unwarranted attack upon the authenticity of the letter. The bill does not certify as a fact that no such difference existed. If it did appear it was perfectly legitimate for counsel to call attention to it. The letter was before the jury subject to their examination.

Bill of exceptions number seven consists of twenty pages. It begins by showing that while the private prosecutor was making his closing argument and while discussing the testimony of defendant's wife, Myra Bowlin, "which was presented to the jury in the following form by questions and answers, to-wit:" Then follows ten pages of questions and answers, being, we presume the entire testimony of Mrs. Myra Bowlin, following that the bill contains ten pages mostly in question and answer form of the testimony of appellant. The bill then concludes by stating that the private prosecutor said to the jury:

"I want to call your attention to the fact that while Mrs. Myra Bowlin was on the stand testifying as a witness she was not asked by defendant whether she had written the letter as above mentioned, and I want to tell you gentlemen the State could not ask the question of the defendant's wife because the defendant had not asked it and defendant's counsel knew that the State could not ask it. That was the reason he did not ask the question himself," to which argument appellant objected. If it is necessary to raed the entire bill to appraise the complaint made against the argument then we must respectfully decline to consider it. It has been too often held by this court that bills of exception in such form are objectionable to again give our reasons therefor. In Mr. Branch's Criminal Laws of Texas, Section 61, he states the rule as follows, citing many authorities in support thereof.

"State's counsel may comment on failure of defendant to produce his wife as a witness, or of any omission in her testimony if she testifies."

From our understanding of the record generally we are of opinion the argument was legitimate.

Appellants bills of exception numbers 9 and 10 may be considered together. Miss Leah Richardson had testified that at the time of the killing deceased was sitting on a trunk writing a letter, and testified that she knew to whom the letter was being written. She also testified that he had written only about three lines when the shot was fired through the window. The letter was then introduced in evidence, and is as follows:

"Tuesday Nite,

My Dear Sweet One—How is dear Clara Maud this rainy nite, fine I hope. As for me, dear, I have the blues tonite, I have—"

Appellant objected that it was immaterial and could throw no light upon the case because the defendant could not be bound by an act of deceased of which he was not aware. Miss Clara Maud Whitstone, a sister of appellant's wife, testified that during the absence of her brother-in-law on the trapping expedition during the month of January she stayed with her sister about two weeks; that during that time deceased was paying her attention and calling on her frequently while there, sometimes at night and sometimes in the day; that he at no time gave her cause to have suspicion of any improper conduct between him and appellant's wife; that deceased continued his visits after she returned to her home, the last visit being on Sunday night before he was killed on Tuesday night, and that witness wrote him a letter on Monday; that they were engaged to be married at the time of the killing. No part of this witness' testimony was objected to save the sole statement that she and deceased were engaged to be married at the time he was killed. Objection was made to this isolated part of witness' testimony on the ground that it was immaterial to any issue in the case, not of a nature to throw light on the trans-

action and further that it was not shown that appellant had any knowledge of that fact. Conceding that the contents of the letter deceased was writing was immaterial, and that the statement made by Miss Whitstone that they were engaged to be married at the time he was killed was also immaterial, we cannot bring ourselves to conclude that the evidence was of such character as to have been prejudicial. Most of the cases cited by appellant in support of this assignment of error are cases where the accused was pleading self-defense and the acts or statements of deceased unknown to him were held to be prejudicial as tending to lead the jury to believe his defensive testimony was un-founded. Such is not the condition in the present instance.

Finding no error in the record justifying a reversal an affirmance of the judgment is ordered.

*Affirmed.*

ON REHEARING.

February 21, 1923.

MORROW, PRESIDING JUDGE.—While the deceased was sitting in his home at night writing a letter, he was shot by the appellant through the window without warning. This unexplained would be murder. The explanation tendered is that appellant had obtained a letter writ-ten by his wife from which he believed that deceased had been guilty of insulting conduct to the wife of appellant; that because of this let-ter and belief, he sought the deceased and killed him upon the first sight of him; that the shots were fired under the influence of passion engendered by the letter which rendered him incapable of cool reflec-tion. If this explanation was true, appellant's offense was not mur-der but was manslaughter. Penal Code, Art. 1129. Appellant claimed that the letter was written by his wife. After she denied it, he killed the deceased, and according to his admission on the trial, his confidence in her virtue was not shaken. Under these facts, it was not for the court to decide that the appellant believed that the letter was written by his wife. The jury, under the statute, was made the judge of the truth of appellant's testimony, and the law demanded that they, under a proper charge, weigh it in the light of the surrounding facts.

Appellant claimed that he shot the deceased at the first meeting. There was some evidence to the contrary, but assuming that he be-lieved that his wife wrote the letter, that it was intended for the de-ceased, and that appellant killed the deceased the first time he met him after the letter was read, the state of his mind was still a matter which the jury and not the court must determine. According to ap-pellant's testimony, he read the letter about noon. He had never seen any improper conduct of deceased toward his wife. She disclaimed writing the letter. He still had faith in her, but he said: "I had formed my plan before I got home." He stayed at home for two hours; hunted for and found his gun. He procured from Fulsom

two buckshot shells.  These, according to Fulsom, appellant said he
wanted to kill a hawk.  He said: "When I did not find Richardson
on the trip in the afternoon, I determined to wait until night."  He
took his family to the home of his brother to spend the night, having
previously passed the home of deceased without stopping.  On enter-
ing his brother's house, appellant left his gun in an outhouse.  He got
his gun and went straight to the home of the deceased and shot him.
He then went back to his brother's home and told him that he had
killed a man *"because he ruined my home."*

It is not the adequate cause alone which reduces the grade of homi-
cide, but passion must result therefrom, which renders the mind in-
capable of cool reflection.  Eanes v. State, 10 Texas Crim. Rep., 421;
Halliburton v. State, 32 Texas Crim. Rep., 51; Branch's Ann. Tex.
Penal Code, Sec. 2029 and cases cited.

The records of this court furnish some instances in which the evi-
dence of adequate cause, the requisite passion and the slaying upon
the first meeting, was conclusive to a degree which excluded every
other theory and rendered it incumbent upon this court to refuse to sanc-
tion the verdict of murder.  See Doss v. State, 43 Texas Crim. Rep.,
551; Stewart v. State, 52 Texas Crim. Rep., 284.  These are excep-
tional cases, contrary to the general rule, which commits to the jury
the decision of the state of mind in which the fatal shots were fired
or the fatal blows were struck.  The testimony of one accused of crime
to a state of facts exculpating him or mitigating the offense is not con-
clusive against the State, especially where there are circumstances tend-
ing to contradict its truth.  Under the statute, the jury is called upon
to determine whether the alleged insulting conduct was the real cause
of the killing.  Penal Code, Art. 1135.  Appellant told his brother that
he had killed a man because he had *"ruined his home."*  In his testi-
mony, he asserts absolute confidence in the virtue of his wife.  The
letter to which he testified was signed: "From Myra to James."  If
she wrote the letter, it bears unmistakable evidence of her infidelity to
the appellant and of affection for someone else.  It did not name the
deceased and was not addressed to him.  Considering the letter, appar-
ently his belief in his wife's purity and his statement that he killed the
deceased because he had ruined his home are contradictory, especially
so in view of his own statement that his wife denied writing the letter.
The deliberation revealed by his testimony concerning his preparations
for committing the homicide and the calmness with which he apparent-
ly selected the time, place and weapon used, are circumstances not to
be ignored by the jury nor by this court, when it is called upon to de-
clare that there was no evidence upon which the jury might reject ap-
pellant's theory that he killed the deceased because of the letter and
that at the time he did so, his mind was thereby rendered incapable of
cool reflection.  On the facts, so far as it illustrates the legal question
involved, the case of Davis v. State, 70 Texas Crim. Rep., 37, is quite

similar, in which case Presiding Judge Davidson wrote the opinion, stating that the parties had been friendly; that it might be safely stated from the record that the insulting conduct of the deceased was the cause of the trouble. We quote from the opinion thus:

"In this case there seems to be no question from the facts that the insult to the wife occurred, and that it was the cause and only cause which led to the killing. None other is shown or sought to be shown except such insulting language used by deceased to appellant's wife. If his mind was agitated and aroused it would be manslaughter; if not so aroused, murder in the second degree would be an issue. Under the authorities above cited we are of opinion that the court did not err in submitting murder in the second degree."

This decision is harmonious with others, and apparently with the ruling of the trial court and this court.

The other matters presented originally are reiterated in the motion for rehearing. They have been re-examined in the light of the motion, but we are constrained to the view that they have been properly disposed of. The motion for rehearing is therefore overruled.

*Overruled.*