**Penni STONER and Alex Martinez, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 56406.**

Court of Criminal Appeals of Texas, Panel No. 3.

July 18, 1979.

Rehearing En Banc Denied Sept. 19, 1979.

Laird Palmer, Joseph D. Martinec, Austin, for appellant.

Ronald P. Earle, Dist. Atty. and Charles E. Hardy, Asst. Dist. Atty., Austin, Robert Huttash, State's Atty., Austin, for the State.

Before DALLY, W. C. DAVIS and CLINTON, JJ.

## OPINION

DALLY, Judge.

Appellants were jointly indicted, tried, and convicted for theft of property having a value of $200 or more but less than $10,-000. Punishment for each appellant was assessed at imprisonment for two years, probated.

Appellants contend that the indictment is fundamentally defective, that there is a fatal variance between the indictment and the proof, that the evidence is insufficient to sustain their convictions, and that the prosecutor engaged in improper jury argument.

■ The indictment alleges that appellants, on or about June 11, 1975,

". . . with the intent to deprive the owner, The State of Texas, of property, namely, 60 pound blue NeKoosa offset Vellum paper, did knowingly and intentionally, without the owner's effective consent, unlawfully obtain and exercise control over (control over and obtain) such property which had a value of more than two hundred dollars ($200.00) and less than ten thousand dollars ($10,000.00) . . ."

Appellants filed no motion to quash the indictment. However, they contend that the indictment is fundamentally defective because it does not allege the quantity of paper stolen, citing Art. 21.09, V.A.C.C.P.

In *Rhodes v. State*, 560 S.W.2d 665 (Tex. Cr.App. 1978), after a thorough discussion of the cases, this Court held that:

". . . a defect in the description of property under Art. 21.09, supra, must be raised by a motion to quash, and may not be raised for the first time on appeal, *unless* the description is so deficient as to be no description at all and to constitute a jurisdictional defect, as was the case in *Willis* [*v. State*, 544 S.W.2d 150 (Tex.Cr. App. 1976)]." (Emphasis in original.)

In *Willis*, a theft indictment was held to be fundamentally defective because it described the property allegedly stolen only as

"merchandise." In *Rhodes*, on the other hand, it was held that a description of the property as "wall paneling" was sufficient to invoke the jurisdiction of the trial court, and that the indictment was not fundamentally defective. The indictment in the instant case describes the property allegedly stolen with more specificity than did the indictment in *Rhodes*. This ground of error is overruled.

Appellant Martinez was at the time of the alleged offense the supervisor of the reproduction room, or print shop, of the Texas Senate. The print shop prepares copies of all Senate bills, publishes the Senate *Journal*, and generally handles the printing needs of the Lieutenant Governor, Senators, and Senate administrative officers. Although the print shop ordinarily handles all of the Senate's printing, it occasionally contracts out printing jobs during peak periods such as the end of a legislative session. Such contracts are awarded on a lowest bid basis.

In February, 1975, Martinez met appellant Stoner at an Austin nightclub, and they became friends. Stoner was at that time employed by the telephone company, but feared that she was going to lose her job. Martinez agreed to help Stoner, who had no experience with regard to paper or printing, establish herself as a printing jobber. This help included instruction in the preparation and submission of bids for Senate print shop contracts. In June, 1975, Stoner began business under the name A.M.P. Graphic Arts (A.M.P.).

In essence, appellants were accused of stealing paper from the State, and then selling it back to the State in the form of completed printing jobs. The following recitation of the facts is based on the testimony of the State's witnesses, and has been simplified as much as this complicated case allows.

On May 30, 1975, Martinez ordered, and the State subsequently paid for, a large quantity of paper for the Senate print shop from the Lone Star Paper Co. of Austin (Lone Star). Included in this order was approximately $1,200.00 worth of blue sixty pound NeKoosa offset vellum. This paper was not delivered to the print shop, but remained in Lone Star's warehouse.

On June 9 or 10, 1975, the Senate print shop solicited bids for the printing of 101,-000 newsletters for Senator Betty Andujar. Among other things, the job specifications stated that the newsletters were to be printed on light blue sixty pound offset paper to be supplied by the printer. On June 10, this contract was awarded to A.M.P. on the basis of the low bid of $2,234.00, and a state treasury warrant was subsequently issued to A.M.P. in this amount.

On June 10 or 11, 1975, Roland Castruita, an estimator for the Whitley Co. of Austin (Whitley) and one of the losing bidders for the Andujar newsletter contract, received a telephone call from Martinez. Martinez explained to Castruita that it had been decided that the Andujar newsletters would be printed on paper already owned by the State, and asked how much Whitley would charge to do the job in that case. Castruita told Martinez that Whitley would print the newsletters on the Senate's paper for $1,165.00, and Martinez replied that Whitley had the job. Martinez then called Earnest Cook, a salesman at Lone Star, and instructed him to deliver to Whitley a portion of the blue sixty pound NeKoosa offset vellum which had been previously purchased.

At no time during his discussions with Castruita did Martinez tell him that anyone other than the State would be paying for the Andujar newsletters, nor did Martinez ever instruct Cook to bill A.M.P. or Stoner for the paper delivered to Whitley. Moreover, both Castruita and Cook testified that they had never heard of Stoner or A.M.P., that A.M.P. did not have a credit arrangement with their respective employers, and that they would not have cooperated with Martinez had they known that A.M.P., not the State, was to be financially responsible. After the newsletters had been printed and delivered, Martinez called Castruita and told him to bill A.M.P., not the State, for the printing. On July 10, 1975, Whitley

received a check for $1,165.00 in payment for the Andujar newsletters. The check was signed by "Penni J. Stoner, A.M.P. Graphic Arts."

Martinez testified that he had had nothing to do with the solicitation of bids for the Andujar newsletters or in awarding the job to A.M.P., and offered evidence that he was in Dallas on the days in question. He also testified that he did not subsequently give Whitley the job of printing the newsletters, and that he did not instruct Cook to deliver to Whitley paper owned by the State. Martinez testified that he had had an arrangement with Cook whereby paper owned by the State and stored in Lone Star's warehouse could be sold by Lone Star and the payment credited to the Senate print shop's account.

In her testimony, Stoner also stated that Martinez had had nothing to do with A.M.P. getting the contract for the Andujar newsletters. Moreover, she testified that she, not Martinez, had called Castruita and arranged for Whitley to print the newsletters as a subcontractor, and that she, not Martinez, had called Cook and ordered that paper be delivered to Whitley. She stated that she did not know that the paper delivered to Whitley belonged to the State, and that she had fully expected to be billed for the paper by Lone Star.

 Appellants contend that there is a fatal variance between the indictment and the State's evidence, since the evidence shows that the property stolen was money, not paper. While it is certainly true that the ultimate objective of appellants was to steal money from the State, the method chosen to achieve this objective was to sell to the State paper which the State already owned. The question to be answered is whether, in the course of carrying out their scheme, appellants stole the paper from the State.

Appellants were indicted under V.T.C.A. Penal Code, Sec. 31.03, as it read prior to its amendment in 1975. Under that section, a person was guilty of theft if, with intent to deprive the owner of property, he obtained or exercised control over the property without the owner's effective consent. There can be no doubt that Martinez exercised control over the paper in question: he ordered it, he had it stored, and he had it delivered to Whitley for use in the Andujar newsletters. But did Martinez exercise this control without the State's effective consent, and with the intent of depriving the State of the paper?

As supervisor of the Senate print shop, Martinez had the authority, i. e., the consent of the State, to award A.M.P. the contract to print the Andujar newsletters and to have the newsletters printed on paper owned by the State. But when he ordered Lone Star to deliver the paper to Whitley and Whitley to print the newsletters on that paper, knowing as he did that the contract to print the newsletters specified that the paper was to be supplied by the printer, he exceeded the scope of his authority. The State never authorized Martinez to use State-owned paper for the private gain of himself or others.

If Martinez and Stoner had contrived to use State-owned paper to carry out a printing contract between A.M.P. and some third party, there can be no doubt that such use of the paper would be without the effective consent of the State. The only difference between this hypothetical situation and what actually occurred is that A.M.P.'s contract was with the State. But the fact that Stoner, acting through A.M.P., intended to sell the paper back to the State does not alter the character of Martinez's conduct. When Martinez had the paper delivered to Whitley pursuant to his scheme with Stoner, he acted outside the scope of his authority as supervisor of the Senate print shop. Or, expressed in the terms of the theft statute, Martinez acted without the effective consent of the State.

The evidence is also sufficient to prove that appellants intended to deprive the State of the paper. The bid submitted by A.M.P. and accepted by Martinez included the cost of the paper to be used for the newsletters, but in fact Martinez had the newsletters printed on paper the State already owned. The State subsequently paid

A.M.P. on the basis of the contract entered into by Martinez, including the cost of the paper. This evidence is sufficient to prove that Martinez and Stoner exercised control over the State's paper with the intent to restore the paper for payment of compensation to A.M.P. by the State. V.T.C.A. Penal Code, Sec. 31.01(3)(B).[1]

V.T.C.A. Penal Code, Sec. 31.03, is much broader than previous theft statutes. In enacting Sec. 31.03, supra, the legislature intended to consolidate a broad range of theft-related offenses, including embezzlement, receiving and concealing embezzled property, swindling, and conversion by a bailee, into the single offense of theft. V.T.C.A. Penal Code, Sec. 31.02. While under the facts of this case appellants certainly could have been prosecuted for the theft of the money they received pursuant to their scheme, Sec. 31.03, supra, is broad enough to encompass the theft of the paper as well. Under the facts presented the appellants could have been convicted of the theft of either the paper or the money, but not both.

We hold that the evidence is sufficient to sustain the convictions of appellants as parties to the theft of State-owned paper. This ground of error is overruled.

■ Appellants contend that the State failed to prove that the paper stolen was blue sixty pound NeKoosa offset vellum as alleged in the indictment. They base this contention on their cross-examination of Cook who, when shown one of the Andujar newsletters, testified that the paper resembled NeKoosa offset but that he could not positively state that it was.

It is undisputed that a portion of the paper ordered on May 30 for the Senate print shop was blue sixty pound NeKoosa offset vellum. Cook testified that at Martinez's direction Lone Star delivered a quantity of this blue sixty pound NeKoosa offset vellum to Whitley. Cook's testimony is corroborated by a Lone Star delivery receipt which is in evidence. Castruita testified that Whitley printed the Andujar newsletters on the blue sixty pound NeKoosa offset vellum delivered by Lone Star. We hold that this evidence is sufficient to establish that the paper stolen was, as alleged, blue sixty pound NeKoosa offset vellum.

Finally, appellants contend that the trial court erred in refusing to instruct the jury to disregard improper jury argument by the prosecutor. The prosecutor made the following statement with reference to the written bids for the Andujar newsletter contract:

". . . I am going to mark this so when you go in the jury room I want each one of you twelve people to look at it carefully: You remember the bids on the Andujar newsletter. This is the bid from the Whitley Company typed in there; there is the bid from the Best Printing Company written in there very clearly in longhand; now here is the bid from A.M.P. Graphic Arts by Penni Stoner, and what do you see on there, folks? The bid was originally $2,334 in Penni Stoner's handwriting, and then in someone else's handwriting it was changed to two thousand two hundred—

"MR. PALMER: Your Honor, that is a complete misstatement, outside the record—there is no testimony as to handwriting—

"THE COURT: Come before the Bench.

(A conference was had at the Bench out of the hearing of the reporter.

"MR. PALMER. My objection, Your Honor, is that the District Attorney is arguing outside the record. There is no testimony in the record as to whose handwriting appears on that exhibit, nor is there any testimony of any qualified expert or any other person that one handwriting is different from any other handwriting; therefore, I would ask the Court

1. V.T.C.A. Penal Code, Sec. 31.01(3), reads in pertinent part, as follows:

"(3) 'Deprive' means:

"* * *

"(B) to restore the property only upon payment of reward or other compensation . .."

to instruct the jury to disregard that argument.

"THE COURT: Ladies and gentlemen of the jury, you are to take the evidence from the witness stand and from the exhibits admitted in evidence before you.

"MR. SHEPPARD: That's right. What I am asking you to do is to look at this bid, look at how Penni Stoner makes her '2' up here and look at the first '2' in there, and then look at the '2' that is marked over the '3' and you will see, I think, from the evidence that it is a different handwriting. You can draw your own conclusions. Reducing that bid by one hundred dollars makes it the lowest bid by six dollars. Who was in a position—what other person would be in a position, that would have a motive to lower that bid one hundred dollars so it would be the lowest bid—only one person, and that's Alex Martinez."

In *Bowlin v. State*, 93 Tex.Cr.R. 452, 248 S.W. 396 (1922), a handwritten letter was an important piece of evidence. In his closing argument, the prosecutor displayed the letter and asked the jury to notice a difference in the handwriting of the signature from the balance of the letter. This Court noted that the bill of exception did not certify as a fact that such a difference existed, but if it did appear, it was legitimate for counsel to call attention to it since the letter was before the jury for their examination.

■ In the instant case, the written bids were in evidence, and appear in the record. The bid from A.M.P. appears to have been changed from $2,334.00 to $2,234.00 and the "2" in question appears to be different from the other "2"s which appear on the bid. Under the circumstances, calling attention to this difference was in the nature of a summation of, or a reasonable deduction from, the evidence.

■ In any event, appellants failed to press their objection to the point of procuring an adverse ruling. *Mayberry v. State*, 532 S.W.2d 80 (Tex.Cr.App. 1976); *Nichols v. State*, 504 S.W.2d 462 (Tex.Cr.App. 1974). After the trial court instructed the jury to take the evidence from the testimony and exhibits, appellants requested no further relief. *Reese v. State*, 531 S.W.2d 638 (Tex. Cr.App. 1976); *Johnson v. State*, 510 S.W.2d 944 (Tex.Cr.App. 1974); *Nevarez v. State*, 503 S.W.2d 767 (Tex.Cr.App. 1974). The error, if any, was not properly preserved.

The judgment is affirmed.

CLINTON, Judge, dissenting.

The indictment in this case, its material parts quoted in the opinion of the Court, awkwardly alleges an offense of theft of the described paper. The underlying undisputed facts, however, do not show a theft of paper in any commonly accepted sense and, accordingly, terms of the indictment and the statute from which it is drawn have been stretched and strained into notions that, realistically, are untenable.

The opinion for the Court states, "In essence, appellants were accused of stealing paper from the State, and then selling it back to the State in the form of completed printing jobs." Not even the State, through its prosecuting attorneys, distilled that essence from either the indictment or the facts.

In his opening statement to the jury panel the chief prosecutor told the jury that the ultimate facts the State would prove were that Martinez ordered Senate paper, already purchased, be supplied to a printing company for its use in doing the job as a subcontractor for Stoner, for which Stoner subsequently billed the State of Texas for both the printing cost and the cost of paper —"and therein lie the charges of this case." In final argument the assistant prosecuting attorney concluded by telling the jury, "If you believe the State paid twice for that paper, then it is guilty; if you don't think they did or if you don't believe we have proved it to you beyond a reasonable doubt, they are not guilty." In his concluding summation, the chief prosecutor reiterated the theme that Stoner, through her sole proprietorship, used State paper that had

been paid for and then charged for the paper on subsequent printing contracts.[1]

The fundamental reason the theory alleged in the indictment is not supported by the facts, but is at variance with them, is that, simply stated, the paper purchased from the distributor moved from that location to the printer and, with the printed material on it, was then delivered to the Senate reproduction room, or printshop, to be used for the purpose ordered, printed and delivered. At all times, from its purchase until delivered to the Senator, the paper was in the care, custody, control and management of Martinez. Indeed, that is precisely what the indictment alleged and the State proved.

The fallacy in the theory of the indictment and the formulation by the Court is that the unique status and capacity of Martinez as supervisor of the reproduction room, or printshop, of the Texas Senate is ignored . in finding that the paper was obtained and controlled "without the owner's effective consent." It is true that upon paying for the paper, the State "owned" it, but acquisition, control and disposition of the paper were all at the instance of Martinez acting within the scope of his authority. Indeed, in its brief the State correctly asserts, "The evidence clearly shows that appellant Martinez ordered the paper under his authorization as an agent of the State of Texas" and, further, "Martinez then ordered the paper being stored at Lone Star Paper Company to be delivered to Whitley for the printing of the newsletter." Thus, in his capacity as agent for the State, Martinez at once obtained and exercised control over the paper and gave effective consent of the State to do what was done with it.

As I see it, the deception that precluded effective consent of a person legally autho-rized to act for the owner really occurred when Stoner claimed and received payment for the printing job in an amount that included cost of the paper which she, contrary to the specifications for and contract to do the job, had not supplied. It is a case, as the State asserted and argued persistently to the jury, of paying twice for the same paper. The theft was of money, the proceeds of the warrant issued by the State to Stoner for the printing job, in an amount that represented cost of the paper.

Accordingly, for the fatal variance between indictment and proof, I would reverse the judgment of conviction and remand the cause.

---

1. The shorthand rendition of the facts followed his somewhat expanded outline of them as follows:

 "Basically what happened is that . . . the State of Texas got charged twice for several thousand dollars worth of paper. What happened was that A.M.P. Graphic Arts submitted some bids on some contracts, about six of them, in which A.M.P. Graphics was paid by the State of Texas to both print and supply the paper. However, A.M.P. Graphics was paid for that, for both the printing and the paper. What we later found out happened was that the paper that was supplied to the State and the State paid A.M.P. Graphics for was State paper already; it had already been purchased by the State . . . and paid for by the Senate. . . ."